SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

K.W. BROWN AND COMPANY, 21st Century Advisors, Inc., K.W. Brown Investments, Inc., Kenneth Brown, Wendy Brown, and Michael Cimilluca, Jr., Defendants.

No. 05–80367–CIV.

United States District Court, S.D. Florida.

Dec. 19, 2007.

Order Supplementing Judgment Jan. 4, 2008.

---

Brian Barry, Senior Trial Counsel and Christopher E. Martin, Senior Trial Counsel for the SEC.

James B. Koch, Esq., Gardiner Koch & Weisberg, Chicago, IL, for Defendants.

Thomas F. Burke, Esq., The Law Office of Thomas F. Burke, P.C., Chicago, IL, for Defendant Michael Cimilluca.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

LINNEA R. JOHNSON, United States Magistrate Judge.

**THIS CAUSE** came on for non-jury trial before the undersigned United States Magistrate Judge by consent of the parties. The trial lasted nine days, commencing September 10, 2007. Based upon the evidence and testimony submitted, and considering the relevant statutes and case law, this Court finds in favor of the Plaintiff and against the Defendants. A final judgment to that effect shall be entered by separate order simultaneously herewith. Pursuant to the requirements of Federal Rule of Civil Procedure 52, the following findings of fact and conclusions of law are hereby issued.

### I. NATURE OF THE CASE

Plaintiff, the Securities and Exchange Commission (the "SEC") has filed the instant action for injunctive and other relief against Defendants K.W. Brown & Company ("Brown & Company"), 21st Century Advisors, Inc. ("21st Century"), (collectively the "Advisers"), K.W. Brown Investments, Inc. ("Brown Investments"), Kenneth Brown ("Ken Brown"), Wendy Brown ("Wendy Brown") and Michael Cimilluca ("Cimilluca") (collectively "Defendants"), for alleged violations of the anti-fraud and books and records provisions of the federal securities laws. The Complaint sounds in five counts, all involving an alleged cherry-picking scheme which Plaintiff contends netted the Defendants more than 4 million dollars while illegally passing more than 9 million dollars of losses onto unsuspecting investors who had placed their trust in Ken Brown and the Investment Advisers.

Specifically, the Complaint alleges: violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") against Defendants Brown & Company, 21st Century, and Ken Brown (Count I); violations of Section 10(b) and Rule 10(b)–5 of the Securities Exchange Act of 1934 ("Exchange Act") against Defendants Brown & Company, 21st Century, and Ken Brown as primary violators and Defendants Cimilluca and Brown Investments as aiders and abettors (Count II); violations of Sections

206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") against Defendants Brown & Company and 21st Century, as primary violators and Defendants Ken Brown, Cimilluca and Brown Investments as aiders and abettors (Count III); violations of Section 207 of the Advisers Act against Defendants Brown & Company, 21st Century, Ken Brown and Wendy Brown (Count IV); and, violations of Section 204 and Rules 204–1(a)(2) and 204–2(a)(8) of the Advisers Act against Defendants Brown & Company and 21st Century as primary violators and Ken Brown and Wendy Brown as aiders and abettors.

## II. FINDINGS OF FACT

### Defendants

1. Defendants Ken and Wendy Brown are married and are residents of Manalapan, Florida. (Stipulated & Defendants Answer to Complaint ¶ 8).

2. Ken Brown is a self-proclaimed "Nationally Recognized Financial Radio Talk Show Host" who hosts a talk show every weekday morning and evening on a Palm Beach, Florida radio station. (Trial Testimony ("TT") 1144–48, Vol. 6 & Ex. 655). He was formerly the CEO of Brown & Co. and is a registered representative of Brown Investments. (Defendants Answer to Complaint ¶ 7). In addition, he was the registered representative for the 180 Account or Brown Trading Account. (Stipulated).

3. Ken Brown is also the primary fundraiser for the Advisers and conducts galas and the radio shows to attract prospective investors. (TT 346 & 356, Vol. 2).

4. Wendy Brown was the President of Brown Investments until June 2005, and is a registered representative of Brown Investments. (Defendants Answer to Complaint ¶ 8).

5. Ken and Wendy Brown control Defendant 21st Century and own 100% of its stock. (Stipulated). 21st Century is a Florida corporation with its principal place of business in Delray Beach, Florida. 21st Century has been registered with the Commission as an investment adviser since 1985. (Defendants' Answer to Complaint ¶ 5). Ken Brown is the President and Wendy Brown is the Secretary and Treasurer of 21st Century. (TT 1091–1092, Vol. 6 & Stipulated).

6. Ken and Wendy Brown also control Defendant Brown & Company and Defendant Brown Investments and they are trustees for the Brown Family Trust that own 100% of Brown Investments and Brown & Company's stock. Ken Brown is a founding partner and current Chief Financial Officer, OP, MP, Director, and Chairman of the Board of Brown & Company and Brown Investments. (Stipulated & TT 1083–92, Vol. 6). Wendy Brown is a founding partner and current Secretary/Treasurer of Brown & Company and Brown Investments. (Stipulated & TT 1083–92, Vol. 6).

7. Defendants 21st Century and Brown & Company are investment adviser firms registered with the Commission that operate their principal place of business at 401 W. Linton Ave., Delray Beach, Florida. Nearly all of the clients of 21st Century and Brown & Company entered into written agreements giving 21st Century and/or Brown & Company discretionary authority over clients' accounts. Since these entities are registered with the Commission, they are required to keep true, accurate and current books and records and complete a disclosure document called a FORM ADV. Part I of its FORM ADV is filed with the Commission on at least an annual basis and contains disclosures regarding, among other things, the amount of assets and accounts under management. Part II of the FORM ADV is maintained at the adviser's principal place of business but is

still considered filed with the Commission and contains disclosures regarding, among other things, conflicts of interests. (Stipulated).

8. As of the date of trial the Advisers still had approximately $57 million of investors' funds under management. (TT 455, Vol. 3).

9. Defendant Brown Investments is a Florida corporation with its principal place of business in Delray Beach, Florida. (Admitted). Brown Investments has been registered with the Commission as a broker-dealer since 1985. (Admitted). Ken and Wendy Brown own and control Brown Investments. (Admitted).

10. After registering Brown & Company as an investment adviser, Ken and Wendy Brown began transferring 21st Century client accounts to Brown & Company. (TT 359–61, Vol. 2; TT 831, Vol. 4; TT 1113–18, Vol. 6 & Ex. 621).

11. Defendant Cimilluca is a resident of Coral Springs, Florida. (Stipulated). He is a registered representative of Brown Investments. (Defendants Answer to Complaint ¶ 9). In September 2002, Cimilluca was hired to day trade the Brown Investments' proprietary account (the "Brown Trading Account"). (Defendants Answer to Complaint ¶ 2)

12. Day trading means buying and selling (or shorting and covering) a security within a single trading day. (TT 1595, L. 11–14, Vol. 8).

13. Cimilluca also day traded several other accounts at Brown Investments even though, for more than four years, he repeatedly testified under oath that he did not make the trading decisions for *any* account other than the Brown Trading Account. (TT 505–09 & 547–563, Vol. 3). During a 2007 deposition, he finally admitted he traded a personal account but still denied he made trading decisions for *any* other accounts. (TT 555, Vol. 3). After

several witnesses and scores of documents contradicted his story, Cimilluca changed his story at the beginning of the trial and admitted he made all trading decisions for a number of other accounts and even received under-the-table payments for managing at least one of those accounts. (TT 551–64, Vol. 3).

14. These "Cimilluca Accounts" were for himself, individuals who played or coached on the same baseball team as Ken Brown and Cimilluca, his in-laws, and business associates of his in-laws and achieved an incredible 99.65% success rate for day trades—281 out of 282 day trades were profitable. (TT 551–64, Vol. 3; TT 1029–32, Vol. 5; TT 1280–86 & 1453, Vol. 7 & Exs. 816, 875, 878–79).

15. From September 2002 through at least June 2006, Cimilluca profited by day trading securities for the Brown Trading Account. (TT 1219, Vol. 6 & Stipulated).

16. Cimilluca had never day traded a proprietary account before, had been unsuccessful trading his own personal accounts, had received little or no training concerning day trading, and never articulated any trading strategy despite numerous opportunities in three separate sworn testimonies taken over a period of more than three years. (TT 611–13, Vol. 3). Ken Brown was aware that Cimilluca had never day traded before, had no training and did not have software telling him when to buy or sell. (TT 1228–30, Vol. 6).

17. Pursuant to Ken Brown's agreement with Cimilluca, Brown & Company paid Cimilluca 50% of all Brown Trading Account profits plus 1% of all commissions generated by the broker-dealer for processing the Advisers client trades. (TT 629–31, Vol. 3; TT 1223–24, Vol. 6 & Ex. 4). Additionally, Brown & Company listed him as the employee responsible for its trading desk and 21st Century identified him as being in charge of trading and

operations. (TT 99–101, Vol. 1; TT 708, Vol. 4 & Exs. 7 & 620).

### March 2003 Examination

18. In March 2003, the Commission's examination staff conducted an examination of the Advisers and identified several instances of improper trading as well as a lack of policies and procedures in place to detect such trading. In a June 10, 2003 letter, (the "Deficiency Letter") the examination staff notified Ken Brown and the Advisers about these deficiencies.

### Employees or Consultants Employed by the Corporate Defendants

19. Ken and Wendy Brown never relinquished their control of the Brown Entities. At various times other individuals were given senior management titles. These individuals, however, always reported to Ken and/or Wendy Brown, were at-will employees with only oral contracts, never owned equity in any of the Brown Entities, and most importantly, were frequently unqualified to hold those positions and devoid of any authority to implement meaningful changes. (TT 290–91, 322–23 & 340–41, Vol. 2).

20. One such individual is Jerry Desiderio, the current President of Brown & Company and the Chief Compliance Officer of Brown & Company and 21st Century. (TT 425 & 433, Vol. 3). Desiderio has been in the securities industry since the 1970's but he never even held a securities license until 1996. (TT 419, L. 8–12, Vol. 3). Until Ken Brown hired him in July/August 2003 to work in operations at 21st Century, Desiderio was unemployed, had previously worked a series of jobs for less than three years, and had never filled out a Form ADV. (TT 419–22, Vol. 3 & Stipulated).

21. When Ken Brown hired Desiderio as an at-will employee with merely a verbal contract, he did not tell Desiderio the Commission sent Ken Brown a Deficiency Letter identifying specific concerns about the Advisers' books and records and improper trading in the Brown Trading Account. (TT 423–24 & 429, Vol. 3).

22. From May 2004 through 2005, Desiderio's duties at 21st Century focused on bringing the firm's annuity information up to date. (TT 425–26, Vol. 3). Desiderio obtained a supervisory license in May 2004 and became the President of Brown Investments in June 2005. (TT 422–425, Vol. 3) Although he is currently the Chief Compliance Officer for all of the Brown Entities, even at trial, Desiderio did not know he held the title of Chief Compliance Officer for Florida Investment Advisory Services, another Brown-controlled entity. (TT 431–33, Vol. 3 & Ex. 451) Despite these titles, Desiderio is still an at-will employee who holds no ownership interest in any of the Brown Entities and receives a salary plus a bonus equal to a percentage of the Advisers' assets under management. (TT 429–434, Vol. 3).

23. Desiderio testified he placed Cimilluca on an unpaid leave of absence after Cimilluca admitted to Desiderio he traded the Cimilluca Accounts "without any of the proper disclosures and without any power of attorneys" and received cash under-the-table to trade at least in one of the Cimilluca Accounts. (TT 508–10, Vol. 3).

24. Although Desiderio knew Cimilluca lied about trading the Cimilluca Accounts under oath during his depositions, he never conducted further investigation concerning Cimilluca's actions and Brown & Company did not fire Cimilluca. He was simply placed on unpaid leave "until the upcoming trial [sic] ... reaches its conclusion" (*Id.* & Ex. 516).

25. Another individual, Patrick Castelli, was hired about the same time as Desiderio. (TT 257, Vol. 2). Castelli responded to an advertisement on the CFA Institute website seeking a chartered financial analyst to conduct research. (TT 257–58, Vol.

2). However, when Castelli interviewed, Ken Brown told him he needed someone to help bring the data in their portfolio management software, Advent, up to date. (TT 258–60, Vol. 2). Although Castelli had never worked with the Advent system, he accepted Ken Brown's job offer and from August/September 2003 to July 2004 worked alongside Desiderio updating portfolio data contained in the firm's Advent system. (TT 259–61 & 264–65, Vol. 2).

26. Castelli also attended the Investment Committee meetings and, like Wasserman, another 21st Century employee, testified the Committee only discussed general market conditions, not specific equities, and Ken Brown made all decisions. (TT 278–83, Vol. 2 & Ex. 125).

27. Ken Brown gave Castelli the title of CEO for 21st Century. Despite this title, Ken Brown never relinquished *any* control to him and routinely ignored Castelli's recommendations although he spoke to Castelli about increasing his responsibilities in the future. Furthermore, no employees reported to Castelli and Castelli himself reported to Ken and Wendy Brown. (TT 266–68, Vol. 2).

28. During his 2004 investigative testimony, Castelli was surprised to learn he was listed as the Chief Compliance Officer for all the Brown Entities since he never had any compliance related responsibilities. (TT 277–78 & 302–04, Vol. 2 & Ex. 30). Furthermore, Castelli never supervised Cimilluca and had little, if any, interaction with him. (TT 277–78, Vol. 2).

29. 21st Century also employed Donald Wasserman for many years. Mr. Wasserman attended Investment Committee meetings, chaired by Ken Brown. The Investment Committee discussed current economic situations, the markets, and how to allocate advisory client mutual fund and annuity assets to certain sectors. The Investment Committee did not discuss individual stocks and Ken Brown ultimately made all of the decisions. (TT 1388, Vol. 7 & Ex. 883 & Stipulated)

30. For at least part of his time with K.W. Brown Investments, Ken Brown asked Mr. Wasserman to "sign off" on daily trade tickets. This was not a substantive review of the trades, but rather a clerical review at the end of the day to ensure the hundreds of tickets processed that day were filled out correctly. He did not review nor was he aware of any log or other document that identified whether the Brown Trading Account or other related accounts traded in the same securities as advisory clients. (TT 1388–89, Vol. 7 & Stipulated)

31. Mr. Wasserman never supervised any registered representatives nor did he have any compliance responsibilities. Although he knew Cimilluca and knew Cimilluca traded a proprietary account for Ken Brown, he did not supervise or otherwise interact with Cimilluca. Mr. Wasserman did not see the Deficiency Letter the SEC's examination staff sent to Ken Brown and he was not aware the SEC expressed any concerns about trading in the Brown Trading Account. Additionally, Mr. Wasserman was not aware of any policies and procedures in place concerning personal trading activity at K.W. Brown Investments. (TT 1389, Vol. 7)

32. Regarding books and records, Mr. Wasserman did not know the SEC's examination staff cited books and records deficiencies. He played no role in preparing Forms ADV for the investment advisers and did not review any Forms ADV. Furthermore, he understood Wendy Brown was responsible for maintaining the books and records and filing its Forms ADV. (*Id.*)

33. Francine Oelbaum worked for KW Brown in compliance and as a sales assistant in the 1990s. After voluntarily leaving the firm, she came back in January

2001 in compliance and as a sales assistant for Ken Brown and others. She stayed with KW Brown through February 2006 when she voluntarily left KW Brown. (TT 331, Vol. 2). During her second stint she only stayed in compliance for approximately six months since Ken Brown was not fond of rules and regulations. (TT 332–33, Vol. 2). Moreover, she eventually left KW Brown in 2006, because, among other reasons, she was concerned about the high number of arbitration cases, high amount of investor turnover, and high number of investor complaints. (TT 333–34 & 388, Vol. 2). She acted as a conduit for investor complaints that Ken Brown received, and used to keep a log of them. One day Ken Brown saw this log in her possession and got very upset about it, took the file away, and said what are you trying to do get me in trouble? (TT 335, Vol. 2).

34. One of Ms. Oelbaum's duties as a sales assistant was to print-out a report showing which accounts had cash, a/k/a the money line. (TT 344–45, Vol. 2). Defendant Cimilluca could run this report as well. (TT 345, Vol. 2). Ken also wanted a report showing all accounts that had activity from the day before. (TT 361, Vol. 2).

35. The Defendants also engaged a consultant, Gail Smith, for two brief time periods. (TT 1026–29, Vol. 5 & Ex. 877). In late 2002 or early 2003, the Defendant entities retained Ms. Smith to perform cost analysis of overhead expenses. She completed her engagement in a few months and recommended some vendor changes and/or contract amendments to Ken and Wendy Brown. (TT 1027, L. 6–11, Vol. 5). She recently started working at the Defendant entities' office location for this engagement when the Commission conducted its routine examination in March 2003. (TT 95, L. 2–8, Vol. 1).

36. For both engagements, Ms. Smith worked as a consultant and not an employee or officer of any Defendant entity. (TT 1027, L. 12–19, Vol. 5 & Ex. 877). She reported directly to Ken and Wendy Brown and only to Ken and Wendy Brown. (*Id.*) Although she did not recall Ken Brown's titles at the firms, she believed he was the control person. (*Id.*) She understood Wendy Brown to be the president and compliance officer who performed managerial duties for the firms. (*Id.*)

37. Ms. Smith had no responsibilities regarding the forms ADV for any Defendant entity and did not create any of the information contained in the forms ADV such as the number of clients or assets under management. (TT 1027–28, Vol. 5 & Exs. 112 & 877). Additionally, she had no role in maintaining effective internal control systems, updating the value of mutual funds or annuities held by clients of the Defendant entities, or maintaining any other client account information. (*Id.*)

### *Ken and Wendy Brown Control Virtually Every Aspect of the Corporate Defendants' Operations*

38. Specifically concerning the broker-dealer operations, Ken Brown's testimony makes it abundantly clear Ken and Wendy Brown controlled virtually every aspect of those operations despite any titles assigned to employees:

1108

Q And let's look at those responsibilities for a moment.

You and Wendy Brown had responsibilities for

hiring, registration of registered representatives and

associated persons; is that correct?

A Yes.

Q You and Mr. Wasserman had supervision responsibilities

of registered representatives and associated persons?

A Yes.

Q You and Mr. Wasserman both had the duty to review transactions?

A Yes.

Q You had the duty for new account review?

A Yes.

Q You had the duty to review customer accounts?

A Yes.

Q You and Wendy both had the duty to review correspondence?

A Yes.

#### 1109

Q You and Wendy both had the duty for customer complaints?

A Yes.

Q You had the duty for advertising, financials, and branch office review?

A Yes.

Q You had other supervisory duties—or responsibilities?

Excuse me. You see that?

A Yes, sir.

Q You had duties for supervisor manual review, correct?

A Yes. Lot of hats.

Q And then turning to, it's Bates stamped KWB 279, it's the third page of the document. You're listed there as the chief executive officer; is that correct?

A Yes.

Q The chief financial officer; is that correct?

A Yes.

Q Financial principal?

A Yes.

Q Record maintenance and retention?

A Yeah.

Q Municipal securities and direct participation programs?

A Yes.

Q And while you were a CEO at this point in time, Wendy Brown was president, correct?

A Yes.

#### 1110

Q And Mr. Wasserman, he was below both of you as vice president, correct?

A Yes.

Q And turning back to the supervisory manual review, so it was your responsibility to update the supervisory manual; is that correct?

A Yes.

Q And you had the ultimate responsibility in reviewing the supervisory manual?

A Yes.

(TT 1105–12, Vol. 6 & Ex. 18).

39. Further, concerning the Brown Trading Account, Ken Brown had ultimate responsibility for the account. Ken Brown was the registered representative for the account; Ken Brown was the compliance principal; Ken Brown was the only supervisor for the broker-dealer for the entire time of this scheme; Ken and Wendy Brown reviewed the account activity; and Ken Brown's name is on the door. (TT 468–69, Vol. 3; 1248–1249, Vol. 6; TT 1298 & 1300–02, Vol. 7 & Exs. 22 & 551).

40. Moreover, as the registered representative for the account Ken Brown could not give away his front-line or primary responsibility to monitor the 180 account. (TT 464, Vol. 3; TT 1249, Vol. 6; and TT 1587–88 & 1697, Vol. 8). Furthermore, Ken Brown admits that he could have, but

did *not* stop Cimilluca from continuing to trade the 180 account. Since he hired Cimilluca, he could fire him but never did. (TT 1112–13 & 1226–28, Vol. 6).

41. Additionally, Ken Brown claimed he resolved the conflict where Cimilluca traded for the Brown Trading Account and entered trades for the Advisers' clients by hiring Cimilluca's father to enter trades for the Advisers' clients trades. (TT 1297, L. 9–14, Vol. 7). Other than the obvious problem that the person Ken Brown hired to eliminate the conflict was Cimilluca's *father* who held no securities license (TT 678, L. 4–6, Vol. 4 & TT 1297, L. 9–14, Vol. 7), Cimilluca and his father shared an office so there was no barrier isolating the Brown Trading Account trader from the person entering Advisory Client trades. (TT 520–23, Vol. 3; TT 1297, Vol. 7). Furthermore, even Cimilluca said he still entered Advisory Client trades when his father was out of the office. (TT 678, L. 1–3, Vol. 4).

### The Advisers Forms ADV Misled Their Advisory Clients

42. As investment advisers registered with the Commission, 21st Century and Brown & Company are required to keep true, accurate and current books and records and complete a disclosure document called a Form ADV. (Stipulated). Intentional misstatements or omissions in Forms ADV constitute federal criminal violations. (TT 456–57, Vol. 3 & Ex. 363).

43. In the Form ADV, the Advisers responded affirmatively that they had numerous past regulatory problems (TT 445–46, Vol. 3). In addition, Ken Brown's disciplinary history with the State of Florida prevented him from acting in a supervisory capacity for two years during the late 1990's. (TT 329, Vol. 2).

44. Wendy Brown updated then filed all of the Advisers' Forms ADV after Ken Brown reviewed them. (TT 884–85, Vol. 5 & TT 1110, L. 11–24, Vol. 6). She filed at least two of the Forms ADV late (TT 875, L. 11–13, Vol. 5), reported assets under management which were not supported by the Advisers' backup documentation on at least 5 additional occasions, and provided false and misleading disclosures concerning the Brown Trading Account continuously over a period of more than 4 years. (TT 836, 847–48, 858–60, Vol. 4; TT 900–01 & 912–14, Vol. 5 & Exs. 419, 422–24, 428, 436, 444, 504–07).

45. Part I of the Form ADV is filed with the Commission on at least an annual basis and contains disclosures regarding, among other things, the amount of assets and accounts under management. (TT 876–877, Vol. 5 & Stipulated).

46. Even after the Commission's examination staff cited the Advisers failure to provide sufficient documents to support their reported assets under management in the Deficiency Letter, the Advisers continued to report erroneous or unsupported amounts of assets under management for the next four years and filed late twice, one time filing almost 8 months late. (TT 858, Vol. 4; TT 875, 887–94 & 900–01, Vol. 5 & Exs. 21A, 424, 444 & 506–07).

47. Even though the Form ADV clearly states on the signature page the person filing the Form ADV certifies under penalty of perjury "that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct," Wendy Brown admitted she only bothered to verify the amount of assets under management once, but she could not recall for which Form ADV filing or for which Adviser. (TT 880–84, Vol. 5 & Ex. 438).

48. Although Wendy Brown testified she maintained physical files of documents to support the reported assets under management, the Defendants never produced any documents reflecting the amounts the Advisers reported to the Commission's ex-

amination staff, the Commission's investigative staff, or the Commission in this litigation. (TT 106–07, Vol. 1; TT 491–504, Vol. 3; TT 879–82 & 890–95, Vol. 5 & Exs. 135 & 504–11).

49. The custom and the practice in the industry is that investment advisers should be able to produce third-party back-up to support the amount of assets under management. (TT 1551–53, Vol. 8).

50. In fact, the Commission's investigative staff requested all documents supporting the reported amounts of assets under management for several time periods. (TT 879–80 & 890–91, Vol. 5 & Exs. 508–09 & 511). After repeated requests, the Advisers produced disorganized and insufficient documentation that, even viewed in the most favorable light, contradicted the amounts reported. The chart below contains those figures: (TT 879–80 & 890–95, Vol. 5 & Exs. 504–511).[1]

| Brown & Company | | |
| --- | --- | --- |
| ADV Date | Reported Accounts / Assets | Accounts / Assets Per Docs |
| 12/20/02 | 400 / $30,825,000 | 400 / $35,889,839.76 |
| 7/22/03 | 700 / $65,269,414 | 500 / $47,789,364 |
| 21st Century | | |
| ADV Date | Reported Clients/Assets | Clients / Assets Per Docs |
| 4/08/03 | 500 / $ 36,000,000 | 620 / $85,838,739 |
| 3/30/04 | 630 / $126,300,000 | —— / $64,081,422 |

51. Desiderio filed Brown & Company's Form ADV annual amendment in June 2007. (TT 443–48, Vol. 3 & Ex. 418). Brown & Company's assets under management, however, had dwindled from more than $80 million to less then $3 million and from 1170 accounts to only 65 accounts in the year since its last amendment. (TT 452–53, Vol. 3; TT 908–910, Vol. 5 & Exs. 418 & 470).

52. In fact, the assets had dropped below the $25 million threshold for a Commission registered investment adviser so Brown & Company's Form ADV indicated that, as an affiliate of 21st Century, it was relying on a "piggyback" exemption that waives the asset threshold for an affiliate of an investment adviser managing more than $25 million in assets. (TT 443–44, Vol. 3 & Ex. 418).

53. By comparison, Wendy Brown had recently reported more than $5 billion for assets under management in 21st Century's annual amendment and failed to disclose the Commission's lawsuit. (TT 900–01, Vol. 5 & Ex. 444). Almost four months later, 21st Century corrected this amount to report approximately $54 million in assets under management and 883 accounts. (TT 451–55, Vol. 3; TT 910, Vol. 5 & Ex. 470).

54. Wendy Brown filed 21st Century's Form ADV annual amendment on March 21, 2007, reporting more than $5 billion for

---

1. The purported back-up documentation provided to the SEC often times consisted of nothing more than handwritten notes with three years of assets under management on the same page and provided no evidence of the source of the figures. (TT 491–504, Vol. 3 & Exs. 135, 505 & 507).

its assets under management and left that misrepresented amount on the Form for all of their clients and potential clients to see and rely on for almost four months until July 2007. (TT 900–01, Vol. 5 & Exs. 444, 419).

55. More than four years after the Commission's examination staff cited deficiencies in the Advisers regulatory reporting and after continuous investigation and this litigation by the Commission, Wendy Brown still carelessly filed the Advisers' Forms ADV. (TT 900–01, Vol. 5 & Ex. 444).

56. Even when Wendy Brown corrected the reported assets under management, she failed to disclose, even as of trial, that the Securities and Exchange Commission sued 21st Century for fraud and other securities law violations. (TT 451, Vol. 3; TT 902–06, Vol. 5; TT 1206, Vol. 6 & Ex. 419). Both the Advisers and Ken Brown admit that 21st Century should have disclosed the SEC's case. (TT 442–50, Vol. 3 & Exs. 433, 418–19 & 444).

57. Part II of the Form ADV (also known as the Disclosure Document) is maintained at Defendants' principal place of business, but is still considered filed with the Commission and contains disclosures regarding, among other things, conflicts of interests. (Stipulated).

58. The Form ADV instructions expressly state "[f]ailure to update your Form ADV, as required by this instruction, is a violation of SEC rule 204–1" and further states that an investment adviser "must update the information in your Part II whenever it becomes materially inaccurate." (TT 855–56, Vol. 4 & Ex. 363 at 3).

59. Additionally, investment advisers must offer to provide Part II of the Form ADV to their clients at least once a year or when Part II is updated to reflect material changes and the Advisers had clients specifically request an updated Part II of Form ADV. (TT 967–69, Vol. 5 & Ex. 31).

60. The Forms ADV, Part II for Brown & Company and 21st Century, as of August 23 and June 18, 2002, respectively, expressly informed advisory clients:

The firm or its affiliates may take positions in the same securities it recommends to clients, under no circumstances will the firm place its own interest ahead of our clients, nor will the firm take a position which could be detrimental to our clients position.

(Ex. 17 at KWB 00273 & Ex. 23 at KWB 00360).

61. This disclosure and therefore the Advisers' Forms ADV, Part II became materially inaccurate when Cimilluca started trading the Brown Trading Account in September 2002. (TT 437, Vol. 3 & Exs. 17, 21A & 23).

62. Seven months after their Form ADV, Part II became materially inaccurate, the Advisers had not updated Part II. The Commission's examination staff discussed this failure in the Deficiency Letter, stating "the Advisers' Form ADV is inadequate and misleading because it failed to make complete and accurate disclosure of such conflicts required by Item 9 of Form ADV Part II" and it specifically identified the "ADVs fail to disclose that (1) related accounts will trade on the same day as clients and receive better prices than clients and (2) that the Advisers' related accounts and their trader had a financial interest and would profit, at the possible expense of clients, when executing clients' trades." (TT 133, Vol. 1 & Ex. 21A)

### The Advisers' Forms ADV Continued to Mislead the Advisory Clients

63. After receiving the Deficiency Letter, the Advisers updated their Form ADV, Part II disclosures. (TT 847–48, Vol. 4 & Ex. 414). However, the updated disclosure below only served to further

mislead the Advisory Clients and the Commission, stating:

> The firm or its affiliates may take positions in the same securities it recommends to its clients; the affiliated broker/dealer maintains an actively traded (primarily a day trading account) solely for its own trading profits that can be considered a conflict of interest to advisory clients in so much as the trading does take positions that are also simultaneously being recommended to advisory accounts. *The firms [sic] trading account has a short-term objective while advisory accounts generally are for retaining positions for a longer term objective. The advisor does not utilize client's [sic] funds* nor does the advisor take positions large enough to influence market price movement or fluctuation. The advisor does not engage in scalping or front running securities. *The conflict is entirely coincidental* and could be entirely possible if the positions are not obtained for the advisory client. It may result in having missed or lost opportunity. If not obtained for clients of differing time objectives it's the advisors position that *under no circumstances will the firm place its own interest ahead of our clients, nor will the firm take a position which could be detrimental to our clients [sic] position.* It is also entirely possible that the broker/dealer affiliate can and does often receive better prices on these same day trades or can trade in an opposite direction of its clients, however this is an inadvertent event due to market fluctuation and not a planned or predetermined occurrence. Prices fluctuate randomly. (Ex. 414, emphasis added).

64. Although the Advisers stated the Advisory Clients retain positions for long term objectives, at trial the Commission introduced account records for the Advisory Clients showing the Advisers often sold Advisory Clients out of positions in just a few short days and at a loss for the Advisory Client. (TT 1162–63, Vol. 6 & Ex. 133). Judge Barry Stone, an advisory client, testified that in seven specific transactions he suffered both unrealized losses *and* realized losses after a short holding period. (Exs. 715–727). Additionally, the Defendants' own expert reviewed examples of realized losses suffered by the Advisers' clients after only holding the positions for a short time period. (TT 1741–1755, Vol. 9 & Exs. 552–53, 555 & 992–94).

65. Additionally, the statement "[t]he advisor does not utilize client's [sic] funds" is demonstrably false since the Defendants utilized the Advisory Client accounts to avoid Brown Trading Account losses. (TT 1455–58, Vol. 7; TT 1490–93, Vol. 8 & Exs. 414, 815 & 817).

66. Furthermore, the Advisers retained the false statement "under no circumstances will the firm place its own interest ahead of our clients, nor will the firm take a position which could be detrimental to our clients [sic] position." (Ex. 17 at KWB 00273, Ex. 23 at KWB 00360 & Ex. 414, last page).

67. Both the original and the revised disclosure misrepresented the nature and extent of the conflicts of interest created by the Brown Trading Account. Incredibly, at trial, Desiderio admitted that in March 2005, 21st Century had changed the entire disclosure back to the original disclosure the Commission's examination staff cited in the Deficiency Letter as "inadequate and misleading." (TT 435–41, Vol. 3 & Exs. 21A, 23).

68. Despite the Advisers' claims "under no circumstances will the firm place its own interest ahead of our clients, nor will the firm take a position which could be detrimental to our clients [sic] position," the documents and a simple comparison of the vast disparity in performance between the Brown Trading Account and Cimilluca

Accounts and the Advisers' clients accounts when they received allocations from the Bunched Trade Account paints an entirely different picture. (TT 1452–61, Vol. 7 & Exs. 811 & 815–17).

### The Brown Entities Financial Problems

69. The broker-dealer only generates revenue from transaction-based commissions. (TT 1093–94, Vol. 6). For Brown Investments, this transaction-based model is only marginally profitable. (TT 1094, L. 13–17, Vol. 6). In fact, the audited financial report for the broker-dealer's 2001 fiscal year ending March 31, 2002, showed the broker-dealer lost money that year. (TT 1141–42, Vol. 6 & Ex. 302).

70. The Advisers only source of revenue is management fees based on a percentage of assets under management. (TT 1092–93, Vol. 6 & Exs. 21A at 2A & Ex. 22 at 2a). From at least July 2002 through approximately April 2004, 21st Century did not charge management fees. (TT 1102, Vol. 6).

71. On August 1, 2002, about the same time 21st Century stopped charging management fees, the Browns registered Brown & Company with the Commission as an investment adviser. (TT 911–12, Vol. 5 & Ex. 422).

72. After registering Brown & Company as an investment adviser, Ken and Wendy Brown began transferring 21st Century client accounts to Brown & Company. (TT 359–61, Vol. 2; TT 831, Vol. 4; TT 1113–18, Vol. 6 & Ex. 621). As of its initial filing, however, Brown & Company had no assets under management and relied on its affiliation with 21st Century to qualify for Commission registration without the $25 million minimum asset requirement. (TT 443–444, Vol. 3).

73. Accordingly, the primary, if not exclusive, source of revenue for all Brown Entities as of July 2002 was the broker-dealer operation which had actually lost

money the prior fiscal year. (TT 911–12, Vol. 5; TT 1092–93 & 1141–42, Vol. 6 & Exs. 302 & 422).

74. Shortly thereafter, on September 10, 2002, Cimilluca began trading the Brown Trading Account. (TT 1219, L. 21–23, Vol. 6).

75. After just six months of Cimilluca's trading activity, the 2002 year-end audited financials show gross income of $376,000 even though the broker-dealer operations were, at best, marginally profitable. (TT 1142–43, Vol. 6).

### Cherry Picking is Illegal and Violates Fiduciary Duties

76. Both Ken Brown and Cimilluca admitted during trial that cherry picking is improper and illegal. (TT 566–68, Vol. 3; TT 1208, Vol. 6 & Ex. 853). They also admitted that following Ameritrade's rules is not a defense to cherry picking. (TT 574–75, Vol. 3 & TT 1213, Vol. 6). Moreover, cherry picking violates National Association of Securities Dealers ("NASD") rules as well. (TT 1577–79, Vol. 8).

77. Cimilluca also testified that he knows he cannot participate or provide substantial assistance to a fraud on Ken Brown's customers. (TT 727, Vol. 4).

78. There is no genuine dispute that the Advisers, their employees and supervised personnel owed fiduciary duties to the Advisers' clients. For example, Ken Brown agreed that:

Q And do you agree that a registered investment advisor,

in order to fulfill its fiduciary duties to its clients, an

investment advisor should make full and fair disclosure of

all material facts necessary for informed decision-making by

clients, particularly where a—particularly where a

possible conflict of interest is involved, irrespective of

whether such disclosure is called for by a specific item in

Form ADV? Do you agree with that statement?

A Yes.

(TT 1118, L. 3–11, Vol. 6. *See also* TT 1207–08, Vol. 6; TT 1692–93, Vol. 8 & Ex. 853).

79. Ken Brown also admits that his discretionary authority is restricted by his fiduciary obligations to his clients. (TT 965–66, Vol. 5). For instance, Ken Brown admitted that he owed investors a duty to always place their best interests before his interests. (TT 1121, Vol. 6. *See also* TT 1249–50, Vol. 6 & Ex. 21A).

### Cherry Picking Scheme Flourished in Lax Internal Control Environment

80. There are heightened conflicts of interest anytime a broker dealer and investment adviser are under common control, even more so when a proprietary account is involved. (TT 1555–56 & 1560, Vol. 8). Hence, this should have been an area with a high amount of internal controls and written documentation of those internal controls and documentation that those internal controls are being followed. (TT 1560–61, Vol. 8).

81. However, the complete opposite occurred, since, among other reasons, Defendants used order tickets that did not include the ultimate client's name or account number on it at the time of trade (TT 1559–60, Vol. 8); allowed gaps in internal controls by not having anyone sign-off on allocation or correction sheets (TT 735, Vol. 4 & TT 1562, Vol. 8); and utilized order tickets that do not show which account(s) ultimately received securities purchased through the Bunched Trade account. (TT 546–47, Vol. 3; TT 734–35, Vol. 4 & Ex. 153A).

82. Moreover, in violation of the Advisers Act, Defendants commingled and failed to segregate the firms' securities from investors' securities, by placing securities that went to the firm's proprietary account and clients in the 180 Account and the Bunched Trade Account. (TT 1598, Vol. 8). In fact, when questioned at trial Ken Brown could not think of any good reason to use the Bunched Trade Account. (TT 1324–25, Vol. 7).

83. In reality, Defendants used the Bunched Trade Account because it was the mechanism by which they could carry out their cherry picking scheme. Ken Brown also did not purchase a computer program, Moxy, for just $15k plus an annual fee (TT 293, Vol. 2) that would have likely stopped the fraud, since Moxy predetermines allocation (TT 292–93, Vol. 2) and ensures average pricing (TT 295, Vol. 2).

### Same Day Overlap

84. The SEC's examination staff identified that both the 180 Account and Adviser's clients were purchasing or selling the same securities on the same trading day and the clients were consistently receiving the worse execution price. (Ex. 21A). The amount of overlap the SEC's examination found was much greater than what they expected to find and it was egregious that the clients were repeatedly receiving the worse execution price. (TT 137–38 & 140, Vol. 1).

85. During May 2004, Cimilluca testified that there was no policy in place regarding same day trading. (TT 736–37, Vol. 4). However, during December 2005, he changed his testimony and testified instead that he made-up a policy to place all trades in the Bunched Trade Account (both client and 180 Account trades) and not allocate shares that went to the 180 Account until after he had already sold the securities in the 180 Account. (TT 737–39, Vol. 4). Cimilluca admitted that the effect

of his made-up policy was that it allowed him to not allocate shares to the 180 Account until after he had profitably day traded the shares. (TT 740–41, Vol. 4). In addition, Cimilluca's made-up policy usually did not have the effect of giving clients the same average price as the 180 Account received. (TT 816–17, Vol. 4). Cimilluca first denied that he used this same policy for his own account, but later admitted that he did. (TT 741–44, Vol. 4). Cimilluca's made-up policy is not written down anywhere and he did not tell Mr. Wasserman about it. (TT 745–46 & 814–17, Vol. 4).

86. Cimilluca testified inconsistently about whether he and Ken Brown noticed the same day overlap. During his May 2004 testimony, Defendant Cimilluca testified that both he and Ken Brown noticed the same day overlap. (TT 661–63 & 666–667, Vol. 4). However, during his December 2005 deposition, Defendant Cimilluca testified that neither he nor Ken Brown noticed the same day overlap. (TT 663–63 & 667, Vol. 4).

87. In the June 10, 2003 Deficiency letter, the SEC's examination staff provided Ken Brown with written notice of multiple, specific deficiencies and/or violations of law, among them:

- The Advisers failed to detect improper trading activities in related accounts, specifically the Brown Trading Account
- The Advisers lacked adequate specific personal trading procedures and did not have any controls in place to prevent improper personal trading.
- Defendant Cimilluca had a personal financial interest in the Brown Trading Account.
- The improper trading and lack of written personal trading procedures identified by the examination staff may violate Section 206 of the Advisers Act which establishes a statutory fiduciary

duty for investment advisers, including an affirmative duty of utmost good faith to act solely in the best interest of the client, and to make full and fair disclosure of all material facts.

- The Advisers' Forms ADV failed to make complete and accurate disclosure of conflicts as required by Item 9 of Form ADV Part II concerning "Participation or Interest in Client Transactions."
- The Forms ADV failed to disclose that (1) related accounts will trade on the same day as clients and receive better prices than clients and (2) that the Advisers' related accounts and their trader had a financial interest and would profit, at the possible expense of clients, when executing client trades.
- The Advisers lacked "basic internal controls" and had problems maintaining current and accurate client account information such as a client list for each Adviser along with the assets per client and each Adviser's total assets.
- The Advisers provided inaccurate and untimely trade blotter reports and it appeared that an employee was changing trading information, without any oversight, in order to reconcile month end client statements.
- Abnormally high number of error trades—specifically, 92 error trades between October 26, 2002 and February 28, 2003—and improperly maintained and/or unspecific records regarding the error transactions.

(Ex. 21A).

### Defendants Used the Allocation and Correction Sheets to Cherry Pick

88. Cimilluca's handwriting is on the allocation and correction sheets. (TT 579, 593 & 610, Vol. 3). In addition, there is no valid proof that the shares that went to the

180 Account from the Bunched Trade Account were always intended for the 180 Account. (TT 575–76, Vol. 3). There was no one in the trading room besides Cimilluca and sometimes his Dad. (TT 576, Vol. 3 & TT 688–89, Vol. 4). Trades were repeatedly placed in the Bunched Trade Account, and then all of those shares were allocated to the 180 Account or the Cimillucas' joint account. (TT 609–11, Vol. 5 & Exs. 235–37).

89. During the SEC's examination, Cimilluca lied to the SEC staff by falsely claiming that he sent allocation sheets for trades placed in the Bunched Trade Account within one hour of entry. (TT 114–16 & 185, Vol. 1). In addition, it was not until December 2005, that the first substantive disclosure was made by Cimilluca that he was using the Bunched Trade Account to process 180 Account trades. (TT 657, Vol. 4). During his December 2005 deposition, Cimilluca falsely claimed that he sent up the allocation sheet to Ameritrade the "second" he finished a trade. (TT 657–59, Vol. 4). However, during his April 16, 2007 deposition, Defendant Cimilluca changed his testimony and testified that he "had no idea" when his allocation sheets actually were faxed to Ameritrade. (TT 660–61, Vol. 4).

90. For just the first nine months of Cimilluca's trading (September 2002 through May 2003) there were 139 corrections.[2] (TT 1429, Vol. 7). This is a very significant number and all corrections were favorable to the 180 Account or Related Accounts. (TT 1431, Vol. 7). Corrections were not due to transposition issues, since 180 and 539 accounts are completely different strings of numbers. (TT 1431–32, Vol. 7). All the correction sheets faxed to Ameritrade were to correct errors that Cimilluca had allegedly made. (TT 710 & 732–34, Vol. 4).

91. The SEC illustrated during questioning of the Defendants' expert witness how through the use of correction sheets Defendants would cherry pick the lower priced block of securities for themselves while investors were harmed by receiving allocations of the higher priced blocks. A few examples,

(Plaintiff's Exhibit No. 552 entered into evidence.)

BY MR. MARTIN:

Q And 552, my understanding is that the 180 account purchased shares on 12/13/02 of Electronic Arts, or ERTS?

A Correct.

Q And from that transaction, it made a total of $45.31?

A Yes.

Q And the clients also got—purchased or had for them purchased securities of ERTS on that same day; is that your understanding?

A That's correct.

Q And those were sold the next 19 days, or so? Nineteen,

1742

20 days, for a loss of $77,000?

A Approximately, yes.

Q Approximately?

A Yes.

Q And that was a realized loss, correct?

A That's absolutely a realized loss.

180 Account. (TT 606–07, Vol. 3 & Ex. 233. *See also* TT 712–13, Vol. 4 & Ex. 208).

**2.** In Ex. 233 there are 34 examples of where shares were originally placed in the Bunched Trade Account and were "corrected" to the

Q And did you ever look at the mechanics of this transaction?

A I don't know what you mean by mechanics.

Q Well, why don't we pull out, if you would, Plaintiff's exhibit 803, which are the schedules by Mr. Collier. If you would refer to the 12/13/02 transaction, ERTS.

\* \* \*

Q And then it shows that that lowest purchase price at 3:53 the fax was received was corrected to the 180 account.

Do you see that?

A I see a correction to the 180 of, yeah, lower one.

Q The lowest one of the three, right?

A Right, 57.09 and change.

Q So the correction had the effect, based on the schedule, of taking the lowest of those three purchases and putting them in the 180 account. You agree with me based on the schedules?

A The correction certainly moved that trade to the 180 account.

Q And then at 3:37 p.m., and a fax that was received at 4:16 p.m., the remaining shares went over to more than 20 individual accounts. Do you see that?

A I do.

Q And if you scroll across on Mr. Collier's analysis, it shows that the one-day Electronic Arts transaction was down

1744

$16,000 and change from the purchase price—for the shares the clients got?

A In the aggregate.

Q In the aggregate.

So that was the unrealized loss at the end of day one?

A That's correct.

Q And exhibit 552 shows that the actual realized loss in that transaction was much greater than that, right?

A It was 77,000, yes.

Q And all that allowed the 180 account to make $45, right?

A I see that the 180 account only made $45.31 on the trade.

Q On a transaction that at the end of the day cost clients $77,000, you agree with that?

A Well, there are two separate transactions. The firm transaction made 45, but as you've pointed out, the clients that got that same stock on the same day eventually lost 77,000.

Q And the clients got the two higher buy prices and the 180 account got the low buy price, correct?

A That's correct.

(TT 1741–44, Vol. 9, emphasis added. *See also* TT 1745–50, Vol. 9 & Exs. 803 & 992–94).

92. Not only did Defendants use corrections to move the lowest price blocks of shares to the 180 Account (TT 1541–42, Vol. 8 & Ex. 803), they used corrections

(and allocations) to minimize losses. (TT 1540–41, Vol. 8).

### Cimilluca Had Little to No experience in Day Trading which is a Very Risky and Speculative Activity

93. Cimilluca had virtually no experience in day trading before Ken Brown hired him. In fact, he had no day trading experience with real money before being hired by Ken Brown, never traded a day trading account before, and did very little trading while at Noble. In addition, he had almost no training as he had never took any courses in day trading and did not use any proprietary software telling him what to day trade (TT 611–15, Vol. 3). Moreover, his personal trading before coming to KW Brown was unsuccessful. He only made around $3,000 a month at his previous employer. (TT 614–121, Vol. 3 & Ex. 351). Furthermore, for shares Cimilluca holds overnight, he admits that he is a horrendous trader. (TT 638–39, Vol. 3).

94. Day trading is very risky due to time limitations, if the market move is unfavorable, you only have a limited amount of time to recover (at most a day). (TT 1154, Vol. 6; TT 1572–73, Vol. 8; TT 693, Vol. 4; TT 1149, Vol. 6; TT 1570–72, Vol. 8; & TT 1733–34, Vol. 9).

95. Cimilluca's results were extraordinarily consistent during the entire 46 months at issue (Sept. 2002 through June 2006), since during this time frame the 180 Account only had four down months. (TT 634–35, Vol. 3 & Ex. 202A). In fact, between April 2003 and December 2004, he did not have a single down month. (*Id*). Moreover, the only down month Cimilluca had between September 2002 and December 2004 (over a two year period), was the month the SEC staff conducted its exam (March 2003). (TT 670–71, Vol. 4 & Ex. 202A). During the entire time period, Cimilluca was the only person who traded the 180 Account. (TT 708, Vol. 4).

96. During September 2002, Cimilluca became employed by Brown & Company, which is dually registered as both an investment adviser and broker dealer. (TT 686 & 707–08, Vol. 4 & Ex. 7). Cimilluca is listed on the organizational charts as being in charge of trading and operations for the investment advisory 21st Century and being in charge of the trade desk for the investment advisory KW Brown. (TT 99–101, Vol. 1 & Ex. 620). Nonetheless, during May 2004, Cimilluca testified that he had no idea what policies or procedures were in place for the Advisers, that no one spoke to him and he was not aware of any policies or procedures in place regarding same day trading, and that he had no discussions with Ken Brown about the SEC's examination or any new policies that were to take place after the exam. (TT 684–87, Vol. 4. *See also* TT 731–32, Vol. 4). In addition, Cimilluca did nothing in response to the SEC's Deficiency Letter. (TT 699–700, Vol. 4 & Ex. 21A).

97. A few days before he hired Cimilluca, Ken Brown reviewed a regulatory filing from Cimilluca's previous employer that explained Cimilluca's departure in the following manner: (TT 394–98, Vol. 2; TT 1218–22, Vol. 6 & Exs. 242, 368, 882).

> Errors were discovered in a trading profit and loss system. Upon correction, adjusted numbers decreased the overall profits of the department, rendering the division no longer viable. Michael Cimilluca was responsible for maintaining the accuracy of this information.

(*See also* TT 674, Vol. 4 & Ex. 2).

98. In response to the SEC's questioning, Cimilluca claimed that he did not recall the substance of any conversation he had with Ken or Wendy Brown about this matter and he did not have an understanding why this language is in his CRD. (TT 692–93 & 812–13, Vol. 4).

99. Cimilluca created a document, Exhibit 19, which he claimed reflected all trades held overnight in the 180 Account from December 2002 to October 2004. This document is materially false in that numerous trades held overnight during the subject time period are omitted. (TT 767–68 & 810, Vol. 4 & Def. Ex. 19).

100. Advent is a portfolio management system used by Defendants and was accurate in calculating the performance of accounts. (TT 469–72, Vol. 3 & Ex. 126). Defendants' own document produced from Advent showed that the 180 Account went up by hundreds of percent a year. (TT 472–74, Vol. 3 & TT 1481, Vol. 8 & Exs. 115 & 812).

101. In stark contrast, Defendants' expert witness, who has been involved in the securities industry for more than 40 years, traded in the pits for the Chicago Mercantile Exchange, and day trades his personal account, only makes about 14% to 15% a year from day trading. (TT 1728, Vol. 9). In addition, he has never seen a situation where over a number of years every day trade is profitable. (TT 1728–29, Vol. 9).

102. At his previous employer, Cimilluca received a salary of $27,000 a year plus 15% of the trading profits after deducting expenses. (TT 395, Vol. 2 & Ex. 882). In his four months trading the Brown Trading Account, Cimilluca received more than $108,000 from Brown & Company. (TT 619, L. 14–21, Vol. 3; TT 1140 & 1224, Vol. 6 & Ex. 117).

103. In 2003, his first full year trading the Brown Trading Account, Brown & Company paid Cimilluca more than $765,000 from the profits he generated for the Brown Trading Account. (TT 619–21, Vol. 3; TT 1224, Vol. 6 & Exs. 118 & 503). In early 2004, he used part of those funds to buy the house in Parkland, Florida where he currently resides. (TT 565–566, Vol. 3 & Ex. 206).

## Investors Suffered Actual Damages/Losses from Defendants' Scheme

104. During the time period that the Defendants were conducting their fraudulent cherry picking scheme, the Advisers lost hundreds of accounts, millions of dollars worth of assets under management, and overall their clients performed very badly. (TT 451–55, Vol. 3 & TT 1149–51, Vol. 6 & Ex. 470). Brown admits that he does not get favorable letters from investors anymore. (TT 1365–66, Vol. 7). Ken Brown's growth, small-cap tech stock focus has not fared well. (TT 124–26, Vol. 1; TT 338–40, Vol. 2 & TT 1149, Vol. 6 & Exs. 612 & 617). He has received customer complaints about overly aggressive trading and losing on stocks that Ken Brown bought for them. (TT 1176–79 & 1185–86, Vol. 6 & Ex. 133).

105. Defendants withheld accounts from the SEC. Even though Defendants claimed that they had produced the performance of all advisory clients for the three year period, they did not include accounts that left during those three years. They did not include accounts such as Judge Stone's that received heavy allocations from the Bunched Trade Account, and more than 1,700 accounts that were still under management with the Defendants. (TT 484–90, Vol. 3 & Exs. 470, 501 & 817). The "cherry-picked" list of accounts that the Defendants did produce to the SEC, still showed that overall their clients preformed very badly. For example, at least 175 clients' accounts (of which at least 78 were IRA accounts) lost money over a three-year period (September 1, 2002 through September 1, 2005) when all the market indexes went-up. (TT 474–84, Vol. 3, TT 1189–94 & 1196–99, Vol. 6 & Ex. 501).

106. Ken Brown testified that Judge Stone would call in and ask that his ac-

count be traded. (TT 962–63, Vol. 5). Judge Stone, however, directly contradicted Ken Brown's sworn testimony, and stated he never got involved with trading decisions, but instead left the decision-making up to Brown. (Ex. 715 at 5–6).

107. Moreover, Judge Stone testified about seven stock transactions where he suffered both unrealized and realized losses. (Ex. 715 at 1–5).

### Defendants Falsely Testified

108. Cimilluca admitted at trial that during October 2002 he became the registered representative for Kenneth (Robert) Morency's account, that he made purchase and sale decisions for his account, and entered into a kickback scheme with Mr. Morency where he would pay Cimilluca 9% of his the profits in cash. (TT 547 & 549–50, Vol. 3 & Ex. 250). During the time this kickback arrangement was in place (October 2002 through March 2005), Mr. Morency's account went up by more than $150,000 (from $50,000 to more than $200,000) and every trade (all were day trades) Cimilluca placed in Mr. Morency's account were profitable. (TT 550–51, 560–61, Vol. 3; TT 980–82 & 1021–22, Vol. 5 & Exs. 205, 217–18 & 251). Defendant Cimilluca also admitted that by no later than February 2004 he was the registered representative for both Tracy Valentine and Dante Grassi, and made purchase and sale decisions on their behalf. (TT 548, Vol. 3 & Exs. 276 & 294). In addition, Cimilluca also traded for the accounts of Linda Columbo, two individuals named Leonard Scarnato (his father-in-law and brother-in-law), and Eleanor Pepio (TT 667–670, Vol. 4). All of the individuals Cimilluca traded for were friends from his baseball team, his wife's relatives, or business associates of his father-in-law. (TT 670, Vol. 4).

109. Prior to the trial, Cimilluca testified falsely about nearly all the above stated matters. At trial, Cimilluca admitted that he repeatedly perjured himself during sworn testimony that he gave to the SEC during its investigation and deposition testimony taken in this matter. (TT 551–63, 568–74, 577–80 & 584–605, 607–608, 613–14, Vol. 3 & Exs. 161, 205–06, 209–11, 213–14 & 217–32, 234–35). He admitted that over nearly a three year period he gave false testimony to the SEC during three separate sworn testimonies—May 24, 2004, April 16, 2007 and April 17, 2007. (*Id.*) Overall, during these three testimonies he gave inaccurate testimony to at least forty-four (44) of the SEC's questions. (*Id.*) A few examples from Cimilluca's trial testimony,

Q. So, now, turning to your April 16th, 2007, testimony in

this matter before the Government, if you would turn to

page 23 of that transcript, line 11 through 16. Am I reading

this question correctly?

Are there other accounts at K.W. Brown besides your

own personal accounts that you can trade directly, besides

your own personal accounts and the Brown trading accounts?

Answer: No.

Did I read that correctly?

A Yes.

Q And that wasn't true, was it?

A No.

Q And when we brought up Mr. Morency, you couldn't recall

if you were an account rep for him, correct?

A Correct.

(TT 555, Vol. 3 emphasis added).

\* \* \*

Q Next question, we asked you.

Question: So it was at the discretion of K.W.

Brown, is that what you're saying?

Answer: No, Mr. Morency would call in and say, buy

me this or buy me that.

0557

Did I read that correctly?

MR. MARTIN: I'm sorry. If you could show him—

THE WITNESS: Correct. I see it, yes.

BY MR. MARTIN:

Q And that wasn't true either?

A No, it was not.

Q Mr. Morency wouldn't call in trades to you, would he?

A No, he would not.

Q You made the decisions?

A Yes, I did.

Q Go down to the next page, page 27, line 5 through 9.

The question is—am I reading this correctly is my

question:

Do you have any explanation why Mr. Morency's

activities would be mirroring or highly correlated with the

Brown trading account?

Answer: No.

Did I read that correctly?

A Yes, you did.

Q And that's not an accurate statement, is it?

A No, it was not.

Q It was highly correlated because you were doing both

sets of trading?

A Correct.

Q And then the next question going down, we asked you,

0558

from lines 10 through 16. We asked:

Question: Did you ever notice that?

Highly correlated is the previous question.

Answer: No.

Did you ever do any trading for Mr. Morency, is the

question.

Answer: No.

Question: You're sure of that?

Answer: Positive.

Did I read that correctly?

A Yes, you did.

Q And that isn't accurate either, is it?

A No, it is not.

(TT 556–58, Vol. 3 emphasis added).

110. Cimilluca testified falsely during these testimonies despite being shown numerous account statements, allocation sheets and other trading records linking him to Mr. Morency's account. (Exs. 161, 205–06, 209–11, 213–14, 217–32 & 234). In addition, Defendant Cimilluca admitted that he knew he was under oath and was giving false testimony to an agency of the Federal government. (TT 561 & 584–85, Vol. 3).

111. Cimilluca did not admit that he had previously testified falsely, until numerous witnesses and documents directly contradicted his perjured testimony. For example, Brown Investments records, account applications and account statements all show that Cimilluca was the registered representative for a number of accounts, including Mr. Morency's account. (TT 458–59 & TT 461–68, Vol. 3 & Exs. 276, 278–79, 291, 294 & 514).

112. Cimilluca testified that the cash he received from Mr. Morency was a form of compensation. (TT 564–65, Vol. 3). He was paid between $13,000 and $14,000. (TT 586–87, Vol. 3; TT 705–06, Vol. 4; TT

983–85, Vol. 5 & Exs. 251 & 256–57). Cimilluca did not, however, report on his tax returns the cash compensation he received from Mr. Morency. (TT 618–28, Vol. 3 & Exs. 351–54).

113. Moreover, Ken Brown also gave inaccurate testimony during sworn testimony to the SEC. Ken Brown knew that Cimilluca was the registered representative for at least Mr. Morency, Mr. Grassi and Mr. Valentine's accounts (TT 1064, Vol. 6), but falsely testified to the SEC that Cimilluca's duties were limited to trading the 180 Account. (TT 1064–65, Vol. 6. *See also* TT 1066, Vol. 6, emphasis added, where Ken Brown testified under oath to the SEC during May 2004 that "Question: Well, you stated that he oversees the company's trading account, which we're going to refer to as account 180. **At any point did he have responsibility at all over any other account aside from the one—aside from account 180? Answer: No.**").

114. Moreover, both Ken Brown and Cimilluca tried to cover-up their fraudulent scheme by trying to convince Mr. Morency to give inaccurate testimony. For instance, on April 16, 2007, after Cimilluca falsely testified at his deposition regarding his relationship with Mr. Morency, Ken Brown went to Mr. Morency's office. (TT 956–58, Vol. 5). Ken Brown testified that at Mr. Morency's office, Morency told him that he did all the trading in his account.[3] (TT 959–60, Vol. 5). Mr. Morency, however, directly contradicted Ken Brown's testimony and testified that Ken Brown asked him to falsely testify that Mr. Morency had done the trading in his brokerage account. Ken Brown's request was false, since Cimilluca did the trading for Mr. Morency's account in exchange for 9% of the profits. (TT 989–90 & 994–95, Vol. 5.

*See also* TT 977, Vol. 5—"Mike preferred it in cash").

115. Moreover, Cimilluca went to Mr. Morency's house that same day after giving false testimony to the SEC. (TT 580–84, Vol. 3). Morency also testified that while Cimilluca was at his house on April 16, 2007 that Cimilluca, just like Ken Brown had earlier in the day, asked him to testify falsely. (TT 990–91 & 995–96, Vol. 5).

116. Unlike Defendants Ken Brown and Cimilluca, Morency has no stake in this litigation. (TT 1023, Vol. 5). In fact, Morency had no motive to give inaccurate testimony since he has been friends with Defendants Cimilluca and Ken Brown for approximately ten years, and Ken Brown has been a client of the radio station that he currently works for around 18 years. (TT 972, Vol. 5).

117. Morency did notice he had no losing trades so he asked Cimilluca about it, but Cimilluca assured him everything was fine. (TT 982, Vol. 5). Morency pulled his funds out of the account because he "felt that if it was too good to be true it probably was, so [he] became suspicious and withdrew the account." (TT 982, Vol. 5. *See also* TT 1025, Vol. 5).

118. Ken Brown is directly tied to the day trading done by Cimilluca for the related accounts, since, among other reasons, Ken Brown was the registered representative for Mr. Grassi when day trades where being placed in Mr. Grassi's account. (TT 1053–58, Vol. 6 & Ex. 279). Ken Brown also admits that he was aware that Cimilluca was placing trades for clients. (TT 1059–60, Vol. 6). Nonetheless, Ken Brown never questioned how profitable day trades were occurring in Mr. Grassi's account (TT 1061, Vol. 6), did not want to

---

**3.** At trial, Ken Brown also gave misleading testimony about the performance of his stock picks for clients. (TT 1363–66; *compare to* TT 1375 & 1378–79).

have all of Mr. Grassi's information in front of him, and did not want to do an extensive review. (TT 1064, Vol. 6).

### Only SEC Examined Flow of Activity from 180 Account

119. The SEC presented evidence of the flow of activity that started in the Bunched Trade Account or the 180 Account. (TT 1396–97, Vol. 7 & TT 1731, Vol. 9 & Exs. 803 & 805–10).

120. From September 2002 through May 2003, for the trades starting in Bunched Trade Account—90% of the trades that went to the 180 Account where winners while conversely 91% of the trades that went to ten or more of the Adviser's clients were losers. (TT 1404–05, Vol. 7 & Exs. 803 & 804). Market forces cannot explain this discrepancy, but cherry picking does explain it. (TT 1405–06, 1433–44, Vol. 7; TT 1494–95, Vol. 8; TT 1732–33 & 1739, Vol. 9).

121. In total the SEC's expert analyzed more than 1,000 trades that started in the Bunched Trade Account. (TT 1488–90, Vol. 8). The results of these trades were polar opposites, because 89% of the trades placed in the 180 Account were winners that generated profits of more than $1.79M while 91% of the trades placed into ten or more customers accounts were losers for losses of more than $3.4M. (Ex. 814).

122. From this scheme, investors suffered real damages, which occurred at the moment they received the pits. (TT 1454–55, Vol. 7 & TT 1535–36, Vol. 8).

123. For the accounts that Cimilluca lied about trading, the results were even more preposterous, since the day trades placed into those accounts were nearly 100% successful. (TT 1410, Vol. 7. *See also* TT 1453–54, Vol. 7—282 day trades and 281 of those trades were winners— 99.65% winners).

124. Defendants also purchased securities in the 180 Account and then moved them to clients' accounts. (TT 1449, Vol. 8 & Ex. 814).

### Everything Cimilluca Touched Was Tainted with Fraud

125. Defendants claimed that Def. Ex. 19, which Cimilluca assisted in creating, reflects all trades held overnight in the 180 Account from Dec. 2002 through Oct. 2004. However, this is simply false as numerous trades held overnight in the 180 Account during this time period are omitted from Defendants' Ex. 19. (TT 1702–09, Vol. 8). For instance, in questioning to the Defendants' expert witness, Mr. Meyer, he admitted that:

Q There's a series of transactions that opened on 1/6 and

closed on 1/7, the first one being Network Appliance for a

thousand shares?

A Yes.

Q You see that on Defendant's exhibit 19?

A I do not.

Q In fact, there's nothing for the entire month of January

on that schedule, is there, of '03?

A No, there isn't.

Q So all these trades aren't there. 1/6, there's a trade

open on Blue Rhino, Zoran, Andrea, Harmony Gold, they're all

opened on 16, sold on 1/7. None of those are on Defendant's

exhibit 19, are they?

A They don't appear on the exhibit, no.

Q And they're all held overnight?

A Yes, according to this document from—wait a minute.

Southwest Securities.

Q There's two different ones. It says K.W. Brown 180, and

1706

then there's below Southwest Securities account.

A Yeah, I was just surprised to see Southwest Securities, that's all.

Q And then the next page, there's a transaction involving Intersil Corp. 1/6 is the open date, 1/7 is the close date?

A Yes, I see that.

Q We don't have to look on 19, in January, it's not there, right?

Brocade below that, opened on 1/7, closed on 1/8.

You see that?

A I do.

Q Don't need to look, right?

A Don't need to look, right.

Q Nividia Corp. on 1/9 through 1/13/'03.

A 500 shares.

Q Held overnight, or longer?

A Yes.

Q No need to look on 19. We know it's not there?

A Not there.

Q This is getting faster.

Foundry, 1/9 to 1/14. Opened on 1/9, closed on 1/14.

A Not even going to look.

Q Not there, right?

Next page, series of transactions in Micromuse

1707

1/17/03, closed on 1/21/03. You see that?

A I do.

Q Don't need to look, right?

A Not gonna look.

Q Network Appliance 1/17/03 to 1/22/03. See that?

A Yes, I do.

Q Don't need to look, right?

A No.

Q And there's additional transactions in—

A January.

Q January, Sandisk, Sanmina–SCI Corp., S-a-n-m-i-n-a dash

SCI, S–C–I, Corp. Another one Sandisk, all held overnight?

A Yes.

(TT 1706–07, Vol. 8).

126. Furthermore, two other documents Cimilluca helped prepare are inconsistent. Cimilluca helped prepare Defendants' Exhibit 17 that shows 100% of the trades made during March 2005 in the 180 Account were profitable, and he helped prepare Ex. 202A that shows during that month there were realized losses (logically, it is impossible to have 100% profitable trades and have realized losses during the same time period). Defendant's expert witness, Burton Meyer, agreed that this does not make any sense. (TT 1678, Vol. 8).

### Ken Brown Was Aware and Ignored Numerous Red Flags

127. Ken Brown admits that he was aware of numerous red flags that Cimilluca was engaging in a cherry picking scheme. Ken Brown admits that:

˜ He was aware of disclosure that Cimilluca was allowed to resign from previous employer Noble is a red flag but hired him anyway. (TT 1219–22, Vol. 6 & Ex. 368)

˜ The SEC's Deficiency Letter is one huge red flag. (TT 1232–33, Vol. 6 & Ex. 21A).[4]

4. Q The whole—the whole letter is a big red flag, right? A Yes. (TT 1233, Vol. 6).

˜ 92 trading Errors in a five month period is a red flag. (TT 1246, Vol. 6).

128. Despite admitting that the SEC's deficiency letter is a huge red flag, Ken Brown did virtually nothing in response. Ken Brown did not implement anything in response to the Deficiency Letter (TT 1233–34 & 1238–40, Vol. 6) and no new written policies were promulgated in response to the Deficiency Letter or exam. (TT 1290–91, Vol. 7). In fact, Ken Brown never wrote down his expectations of Cimilluca regarding his trading in the 180 Account. (TT 1231–32 & TT 1246–47, Vol. 6).

129. Ken Brown also ignored numerous other red flags that Cimilluca was engaging in a cherry picking scheme. Ken Brown:

˜ Claims 100% profitability for day trading in accounts Cimilluca was trading is not a red flag. (TT 1070–71, Vol. 6. *See also* TT 1063 & 1218, Vol. 6).

˜ Admits that day trading is a highly speculative activity that is a form of gambling, but claims that the results obtained by Cimilluca were not a red flag. (TT 1218, Vol. 6).

˜ Claims Cimilluca's financial interest in the account is not a red flag even though he is aware that he gets 50% of the profits of an account. (TT 1224, Vol. 6).

˜ Claims Tremendous Rate of Return for the Account is not a Red Flag.[5] (TT 1259, Vol. 6 & Ex. 115).

˜ Claims that same day overlap is not a red flag despite the fact there are approximately 10,000 securities to choose from. (TT 1287–88, Vol. 7).

˜ Claims that $4.6 million in profits from day trading account is not a red flag. (TT 1292–93, Vol. 7).

˜ Claims that day trading and only having four down months out of 46 months is not a red flag. (TT 1296, Vol. 7).

˜ Claims that it's not a red flag that it's impossible to see from the order tickets which accounts ended up with the shares originally purchased in the Bunched Trade Account. (TT 1318–21, Vol. 7 & Ex. 153A).

130. Red flags should have led Ken Brown to know that a cherry picking scheme was occurring. (TT 1580–83, 1586–87 & 1589, Vol. 8). In addition, in the industry a Deficiency Letter is more than a red flag. (TT 1591–92, Vol. 8).

131. Ken Brown ignored the obvious. Ken Brown admitted that approximately once a week, he did spot checks of the Bunched Trade and 180 Account but never noticed trades were going through the Bunched Trade account. (TT 1298–1300, 1303–11 & 1315–18, Vol. 7 & Exs. 703–04). For example,

3 Q So in total, there was-during the month of July of

4 2005, there was 39 of these transactions started in the 539

5 and ended up in the 180?

6 A Yes.

7 Q And then in the time frame the SEC has reviewed, more

8 than 700 of these transactions took place, activity placed in

**5.** Q And so is it your understanding that this document's indicating for the seven-month period of 8/31/02 to 3/31/03, that the 180 account went up 316 percent? A That's what the numbers are showing.
Q Did that raise a red flag at all to you that Mr. Cimilluca was able to achieve a return of 316 percent in the first seven months of trading? A No. (TT 1219, Vol. 6, emphasis added). Amazingly, Ken Brown testified that he thought the account should have performed even better. (TT 1263–65, Vol. 6 & TT 1293, Vol. 7).

the 539, ended in the 180. Are you aware of that?

A No.

Q And you never noticed, from at least the time of your

deposition, February of 2007, that the activity that was

starting in the 539 account was ending up in the 180 account,

did you?

A No.

(TT 1318, Vol. 7).

132. Ken Brown admits there was no good reason to even use the Bunched Trade Account. (TT 1323–25, Vol. 7).

133. Amazingly, Ken Brown initially claimed that he had never seen allocation sheets, but still claimed he did a thorough review. (TT 1325–26, Vol. 7 & Ex. 162).

134. Ken Brown also claimed that he had never seen correction sheets and never noticed trades being moved from the Bunched Trade Account to the 180 Account, even though he claimed that he spot checked corrections. (TT 1326–29, Vol. 7 & Ex. 176).

### *Defendants' Ill–Gotten Gains*

135. The Defendants reaped more than $4.6 million dollars in illegal profits from their scheme. The SEC claims an additional amount of $9.34 million in losses avoided accruing to the Advisers' clients. (TT 1452–61, Vol. 7, TT 1490–92, Vol. 8 & Exs. 811, 815–17).

136. Ken and Wendy Brown used the gains from the 180 Account for the benefit of the Corporate Defendants, which pay their salaries. (TT 1482–87, Vol. 8 & Ex. 813). During this time, Ken and Wendy Brown paid themselves, more than $3 million and $390k, respectively. (Ex. 503).

## III. *CONCLUSIONS OF LAW*

### A. *THE ADVISERS AND KEN BROWN VIOLATED THE ANTI–FRAUD PROVISIONS OF THE SECURITIES ACT AND THE EXCHANGE ACT (COUNTS I AND II)*

Brown & Company, 21st Century, and Ken Brown violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder by allocating favorable trades to the Brown Trading Account at the expense of their advisory clients without first disclosing this practice.

### *Standard of Proof*

The SEC must prove these violations by a preponderance of the evidence standard. *SEC v. Ginsburg*, 362 F.3d 1292, 1298 (11th Cir.2004) (the "SEC must prove violations of § 10(b) and § 14(e), and their supplementary Rules, by a preponderance of the evidence, and may use direct or circumstantial evidence to do so"); *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n. 30, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (10(b) suit proven by preponderance of the evidence); *SEC v. CM Joiner Leasing Corp.*, 320 U.S. 344, 355, 64 S.Ct. 120, 88 L.Ed. 88 (1943) (17(a) suit proven by preponderance of the evidence).

### *The Elements of Section 17(a) of the Securities Act and 10(b) of the Exchange Act*

Section 17(a) of the Securities Act proscribes fraudulent conduct in the offer or sale of securities and Section 10(b) and Rule 10b–5 of the Exchange Act proscribe fraudulent conduct in connection with the purchase or sale of securities; essentially the same type of practices. *United States v. Naftalin*, 441 U.S. 768, 773 n. 4, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979); *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir.1999); *SEC v. Gane*, 2005 WL 90154, at *10–11, 2005 U.S. Dist. Lexis 607, at

*28–29 (S.D.Fla. January 4, 2005). Section 17(a) of the Securities Act makes it unlawful "in the offer or sale of" securities, by jurisdictional means, to:

(1) employ any devise, scheme or artifice to defraud; (2) obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary to make the statement made not misleading; or (3) engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser

Similarly, Section 10(b) of the Exchange Act provides in pertinent part that it shall be unlawful for any person, directly or indirectly, to use or employ, in connection with the purchase or sale of any security, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the SEC may prescribe as necessary or appropriate in the public interest or for the protection of investors. 15 U.S.C. § 78j(b). Rule 10b–5, promulgated under the Exchange Act, provides in pertinent part:

It shall be unlawful for any person, directly or indirectly,

(a) To employ any device, scheme, or artifice to defraud;

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

Notably, the "SEC does not need to prove investor reliance, loss causation or damages" in actions under 10(b) or 17(a). *SEC v. Credit Bancorp*, 195 F.Supp.2d 475, 490–91 (S.D.N.Y.2002); *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963); *SEC v. Merchant Capital*, 483 F.3d 747, 764–65 (11th Cir.2007) (Eleventh Circuit does not mention of any of these elements when listing elements the SEC must prove to show violations of 10(b) or 17(a)).

However, scienter is required to establish violations of § 17(a)(1) of the Securities Act, as well as § 10(b) and Rule 10b–5 of the Exchange Act. "Scienter" is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Aaron v. SEC*, 446 U.S. 680, 686 n. 5, 695–97, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *SEC v. Steadman*, 967 F.2d 636, 641 (D.C.Cir.1992).

The elements of Sections 17(a)(2) and (3) of the Securities Act are the same, except the SEC does not have to prove scienter, only negligence. *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir.2001); *Gane*, 2005 WL 90154, at *11, 2005 U.S. Dist. Lexis 607, at *29.

### *The Cherry–Picking Scheme Operated As Scheme to Defraud*

The cherry-picking scheme compromised the Advisers and Ken Brown's investment decisions and resulted in hundreds of trades not being made in the Advisers' clients best interests. In nearly every conceivable way the cherry-picking scheme operated as a "device, scheme, or artifice to defraud" and operated "as a fraud or deceit upon" investors, because, among other reasons,

˜ Defendants knew that it was unlawful for them to engage in cherry picking or participate in fraud against the Advisers' clients. Findings of Fact (FF), *supra*, ¶¶ 76–79.

~ Defendants commingled and failed to segregate the firm's securities from investors' securities by purchasing securities in the 180 Account that were subsequently allocated to investors and by purchasing securities in the Bunched Trade Account that were subsequently allocated to either investors or the 180 Account. FF, *supra*, ¶ 82.

~ Defendants used correction and allocation sheets as a tool to move blocks of securities to favored or disfavored status based on subsequent market movement. FF, *supra*, ¶¶ 90–92.

~ Defendants Ken Brown and Cimilluca gave misleading and false testimony to hide from the SEC the accounts Cimilluca traded, which enjoyed a nearly 100% success rate. FF, *supra*, ¶¶ 111–114; 120.

~ Cimilluca lied to the SEC's examination staff about Ameritrade's allocation policy. FF, *supra*, ¶ 89.

~ Defendants gave a series of ever-evolving, shifting and evasive explanations of their trading policies and procedures. FF, *supra*, ¶ 96.

~ Defendants falsely disclosed in Forms ADV their trading activities. FF, *supra*, ¶¶ 60–68.

~ Defendants received more than 90% of the winners while investors received nearly 90% of the losers. This disparity cannot be explained through market forces and it is more likely than not that it was caused from cherry picking. FF, *supra*, ¶ 120.

Accordingly, by its very nature, the cherry-picking scheme operated as a fraud on the Advisers' clients, which is prohibited under 10b–5(a) and (c).

Another way to establish violations of Sections 17(a)(1) and 10(b), is for the SEC to show Brown & Company, 21st Century, and Ken Brown made: (1) a misrepresentation or omission; (2) of material fact; (3) acting with scienter; (4) in connection with the purchase or sale of securities; (5) while using the facilities of interstate commerce. *Basic, Inc. v. Levinson,* 485 U.S. 224, 235, n. 13, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *SEC v. Corporate Relations Group,* No. 6:99–cv–1222–Orl–28KRS, 2003 WL 25570113, at *7, 2003 U.S. Dist. Lexis 24925, at *24 (M.D.Fla. March 28, 2003); *SEC v. Unique Financial Concepts,* 119 F.Supp.2d 1332, 1339 (S.D.Fla.1998), *aff'd,* 196 F.3d 1195 (11th Cir.1999).

### The Advisers and Ken Brown Made False Statements and Omissions

■ A defendant makes a false statement when he "acting alone or with others, creates a misrepresentation." *In re Enron Corp. Sec. Litig.,* 235 F.Supp.2d 549, 588 (S.D.Tex.2002). This can encompass participating in a course of business that operates as a fraud on the buyers or sellers of stock. *SEC v. Zandford,* 535 U.S. 813, 819–22, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002); *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 152–53, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). Additionally, Rule 10b–5 expressly makes it unlawful to "omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5 (2006); *Gane,* 2005 WL 90154, at *11, 2005 U.S. Dist. LEXIS 607, at *30 (citing *Ackerman v. Schwartz,* 947 F.2d 841 (7th Cir.1991) ("Federal securities laws require persons to tell the truth about material facts once they commence speaking.")).

Ken Brown and the Advisers affirmatively stated in Forms ADV that "under no circumstances will the firm place its own interest ahead of our clients, nor will the firm take a position which could be detrimental to our clients [sic] position." Their Forms ADV also expressly stated "[t]he advisor does not utilize client's [sic] funds."

These affirmative statements were false because the Defendants placed their personal financial interest in the Brown Trading Account ahead of their clients' best interests by keeping profitable day trades for themselves. Furthermore, the Defendants *did* use client funds by pushing losses into Advisory Client accounts. Having chosen to make these misrepresentations, the Defendants failed to disclose they were operating a cherry-picking scheme.

### *The False Statements the Advisers and Ken Brown Made Were Material*

█ The standard of materiality is whether or not a reasonable investor or prospective investor would have considered the information important in deciding whether or not to invest. *Steadman*, 967 F.2d at 643; *Levinson*, 485 U.S. at 231–32, 240, 108 S.Ct. 978; *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). The existence of a conflict of interest is a material fact which an investment adviser must disclose to its clients because a conflict of interest "might incline an investment adviser—consciously or unconsciously—to render advice that was not disinterested." *Capital Gains Research Bureau, Inc.*, 375 U.S. at 191–92, 84 S.Ct. 275. The Court finds that reasonable investors would have certainly considered this practice and the subrogation of their interests when deciding whether to place their money with and trust in Ken Brown and the Advisers.

### *The Advisers and Ken Brown Acted With Scienter*

The SEC must show Brown & Company, 21st Century, and Ken Brown acted with scienter, which the courts have defined as either knowing misconduct or severe recklessness—extreme departure from the standards of ordinary care. *Hochfelder*, 425 U.S. at 193, 96 S.Ct. 1375; *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1322 (11th Cir.1982). The Eleventh Circuit has defined severe recklessness as involving "highly unreasonable omissions or misrepresentations ... that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir.1989) (citation omitted). A company's scienter may be imputed from that of the individuals controlling it. *See SEC v. Blinder, Robinson & Co.*, 542 F.Supp. 468, 476 n. 3 (D.Colo.1982) (citing *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1096–97 nn. 16–18 (2d Cir.1972)). As a principal of the investment adviser, Brown's mental state may be imputed to the Advisers.

The Court finds the Advisers and Ken Brown acted with scienter. It is clear from the facts that Ken Brown knowingly put his interests above those of his clients by allowing Cimilluca to allocate profitable day trades to an account in which Ken Brown had a personal financial interest, the Brown Trading Account. In fact, since September 2002, the Brown Trading Account generated more than $4.5 million in profits while causing the Advisory Clients to incur losses of more than $9 million. In addition, Ken Brown acted with scienter, because, *inter alia:*

˜ He was the Registered Representative over the 180 Account and thus had primary responsibility over the account. FF, *supra,* ¶ 2, 39–40.

˜ He knew that it is illegal to cherry pick. FF, *supra,* ¶ 76.

˜ He was warned by the SEC's examination staff but allowed the conduct to continue for years. FF, *supra,* ¶¶ 84–87.

˜ He spot-checked the trading in the 180 Account and the Bunched Trade Account. FF, *supra,* ¶ 131.

˜ He knew of numerous red flags. FF, *supra,* ¶ 127.

˜ He ignored numerous red flags. FF, *supra,* ¶ 129.

˜ He ignored the obvious. FF, *supra,* ¶¶ 130–134.

Evidence of scienter is also particularly strong in this case considering that the scheme went on for years and on more than a hundred occasions, profitable trades were "corrected" to the 180 Account. FF, *supra,* ¶ 90.

### The Advisers and Ken Brown's Conduct Meets the "In Connection With" Test

■ In determining whether a misstatement or omission is related to later securities transactions, the Supreme Court has held courts should broadly interpret the "in connection with" language of Section 10(b) because the securities laws "should be construed not technically and restrictively, but flexibly to effect [their] remedial purposes." *Zandford,* 535 U.S. at 819, 122 S.Ct. 1899. Statements or omissions made with regard to trading in general, not just particular transactions, meet the "in connection with" requirement. *In re Carter–Wallace, Inc. Sec. Litig.,* 150 F.3d 153, 156 (2d Cir.1998) (company statements in technical medical journals were in connection with trading of securities), *aff'd,* 220 F.3d 36 (2d Cir.2000).

The cherry-picking scheme in the instant case satisfies the "in connection with the purchase or sale" requirements of Section 10(b) and Rule 10b–5 of the Exchange Act. Specifically, as part of the scheme, Brown Investments and Cimilluca placed numerous buy and sell orders for securities. *See SEC v. Rana Research, Inc.,* 8 F.3d 1358, 1362 (9th Cir.1993) (in connection with requirement satisfied if the "fraud … somehow 'touch[es]' upon securities transactions" (quoting *SEC v. Clark,* 915 F.2d 439, 449 & n. 18 (9th Cir.1990) ("in connection with" requirement more broadly construed in SEC actions than in private actions))).

### The Advisers and Ken Brown's Actions Were Part of Interstate Commerce

Defendants have stipulated that they used the means or instrumentality of interstate commerce, or the mails in connection with the offer, purchase and sale of securities. **[Stipulated]**

Therefore, through this fraudulent scheme and by failing to disclose the scheme, Brown & Company, 21st Century and Ken Brown willfully violated Section 10(b) and Rule 10b–5 of the Exchange Act and Section 17(a) of the Securities Act. *See Zion Capital Management LLC,* Advisers Act Release No. 2200 (Dec. 11, 2003) (investment adviser violated Section 17(a) of the Securities Act, Section 10(b) and Rule 10b–5 of the Exchange Act, and Sections 206(1) and 206(2) of the Advisers Act by engaging in cherry-picking scheme which favored account in which owner had an interest over that of an advisory client) (Commission Opinion)

### B. CIMILLUCA AND BROWN INVESTMENTS AIDED AND ABETTED VIOLATIONS OF THE ANTI–FRAUD PROVISIONS OF THE SECURITIES ACT AND EXCHANGE ACT (COUNT II)

■ For aiding and abetting liability under the federal securities laws, three elements must be established: (1) a primary or independent securities law violation committed by another party; (2) awareness or knowledge by the aider and abettor that his or her role was part of an overall activity that was improper; also conceptualized as scienter in aiding and abetting antifraud violations; and (3) that the aider and abettor knowingly and substantially assisted the conduct that constitutes the violation. *See Graham v. SEC,* 222 F.3d 994, 1000 (D.C.Cir.2000); *Woods*

*v. Barnett Bank,* 765 F.2d 1004, 1009 (11th Cir.1985); *Investors Research Corp. v. SEC,* 628 F.2d 168, 178 (D.C.Cir.1980), *cert. denied,* 449 U.S. 919, 101 S.Ct. 317, 66 L.Ed.2d 146 (1980); *IIT v. Cornfeld,* 619 F.2d 909, 922 (2d Cir.1980); *Woodward v. Metro Bank,* 522 F.2d 84, 94–97 (5th Cir. 1975); *SEC v. Coffey,* 493 F.2d 1304, 1316–17 (6th Cir.1974), *cert denied,* 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975); *Russo Sec. Inc.,* 53 S.E.C. 271, 278 & n. 16 (1997); *Donald T. Sheldon,* 51 S.E.C. 59, 66 (1992), *aff'd,* 45 F.3d 1515 (11th Cir.1995); *William R. Carter,* 47 S.E.C. 471, 502–03 (1981).

### The SEC Has Established Primary Violations

■ In the preceding section, the SEC established primary violations of the antifraud provisions of the Securities Act and Exchange Act by the Advisers and Ken Brown.

### Cimilluca and Brown Investments Displayed Scienter

Thus, the SEC must show Brown Investments and Cimilluca were aware their conduct was part of an overall activity that was improper. This awareness requirement can be satisfied by extreme recklessness, which can be shown by "red flags," "suspicious events creating reasons for doubt," or "a danger ... so obvious that the actor must have been aware of" the danger of violations. *Howard v. SEC,* 376 F.3d 1136, 1143 (D.C.Cir.2004) (citations omitted). The knowledge or awareness requirement can be satisfied by recklessness when the alleged aider and abettor is a fiduciary or active participant. *See Ross v. Bolton,* 904 F.2d 819, 824 (2d Cir.1990); *Cornfeld,* 619 F.2d at 923, 925; *Rolf v. Blyth, Eastman Dillon & Co. Inc.,* 570 F.2d 38, 47–48 (2d Cir.1978), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); *Woodward,* 522 F.2d at 97.

First off, the Ameritrade documents show the cherry-picking scheme began in approximately September 2002 when Cimilluca started trading the Brown Trading Account and also placed trades in the Bunched Trade Account. Thus, it was impossible for Cimilluca not to know about the cherry-picking scheme since he was doing the actual trading that constituted the cherry picking scheme. Notably, no one besides Cimilluca admitted to trading the 180 Account or the Cimilluca Accounts.

Moreover, the TD Ameritrade allocation and correction sheets show Cimilluca did not identify for which account(s) a various order was intended until well after the trade was executed and Cimilluca knew whether the subject security appreciated or depreciated during the trading day.

With respect to Brown Investments, a company's scienter may be imputed from that of the individuals controlling it. *See SEC v. Blinder, Robinson & Co.,* 542 F.Supp. 468, 476 n. 3 (D.Colo.1982) (citing *SEC v. Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1096–97 nn. 16–18 (2d Cir. 1972)). Ken Brown controls Brown Investments. Thus, Ken Brown's scienter, as a primary violator, may be imputed to Brown Investments.

### Cimilluca and Brown Investments Substantially Assisted the Fraud

■ The element of substantial assistance is met when, based upon all the circumstances surrounding the conduct in question, a defendant's actions are a "substantial causal factor" in bringing about the primary violation. *See Woods v. Barnett Bank of Fort Lauderdale,* 765 F.2d 1004, 1013 (11th Cir.1985) ("based upon all circumstances"); *Rolf v. Blyth, Eastman, Dillon & Co., Inc.,* 570 F.2d 38, 48 (2d Cir.1978) ("substantial causal factor"). When the fraud began, Cimilluca traded for the Brown Trading Account and en-

tered trades for the Advisory Clients in the Bunched Trading Account. Cimilluca traded the Brown Trading and the Related Accounts. These accounts received nearly all of the profitable trade allocations to the detriment of the Advisory Clients.

The Brown Trading Account and the Related Accounts continued to benefit from profitable trade allocations and corrections until at least June 2006. Brown Investments executed all trades for this fraudulent scheme. Brown Investments failure to implement policies and procedures permitted this fraudulent scheme to continue until at least June 2006. Cimilluca and Brown Investments were a substantial causal factor in the primary antifraud violations. Accordingly, Cimilluca and Brown Investments aided and abetted the Advisers and Ken Brown's Violations of the anti-fraud provisions of the Securities Act and Exchange Act.

## C. *THE ADVISERS VIOLATED THE ANTI–FRAUD PROVISIONS OF THE ADVISER ACT (COUNT III)*

Similar to Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act, Sections 206(1) and 206(2) of the Advisers Act prohibit fraudulent conduct by investment advisers with respect to their clients. Section 206(1) of the Advisers Act prohibits investment advisers from employing "any device, scheme, or artifice to defraud any client or prospective client." U.S.C. § 80b–6(1). Section 206(2) of the Advisers Act similarly prohibits investment advisers from engaging in "any transaction, practice, or course of business which operates as a fraud or deceit upon a client or prospective client." U.S.C. § 80b–6(2)

The SEC must prove scienter to establish a violation of Section 206(1) of the Advisers Act, but scienter is not an element of Section 206(2). *Steadman v. SEC,* 603 F.2d 1126, 1133–34 (5th Cir.1979), *aff'd on other grounds,* 450 U.S. 91, 101 S.Ct.

999, 67 L.Ed.2d 69 (1981). The scienter requirement under Section 206(1) has been defined by the general standards utilized under the antifraud provisions of the Securities Act and the Exchange Act. *SEC v. Wall St. Publ'g. Inst., Inc.,* 591 F.Supp. 1070, 1084 (D.D.C.1984).

The Supreme Court has interpreted Section 206 to impose a fiduciary duty on investment advisers, requiring an affirmative obligation of utmost good faith and full and fair disclosure of all material facts to an investment adviser's clients. *Capital Gains Research Bureau, Inc.,* 375 U.S. at 194, 84 S.Ct. 275.

Unlike the antifraud provisions of the Securities Act and the Exchange Act, Section 206 of the Advisers Act does not require that the activity be "in the offer or sale of any" security or "in connection with the purchase or sale of any security." Advisers Act Release No. 1092, 6 Fed. Sec. L. Rep. (CCH) ¶ 56,156E, at 44,057–7 to 44,058 (Oct. 8, 1987).

Thus, the elements for liability under Section 17(a) of the Securities Act and Section 10(b) and Rule 10b–5 of the Exchange Act are more stringent than the requirements to violate Sections 206(1) and (2) of the Advisers Act.

 The Advisers had a duty to act for the benefit of their clients and to make full and fair disclosure of all material facts. The Advisers violated Sections 206(1) and 206(2) of the Advisers Act by failing to disclose their practice of allocating favorable trades to Brown Trading Account at the expense of their clients and failing to disclose the conflict of interest created by Defendants' financial interest in the Brown Trading Account.

In fact, the Advisers affirmatively stated to the contrary that "under no circumstances will the firm place its own interest ahead of our clients, nor will the firm take

a position which could be detrimental to our clients [sic] position" while routinely taking profitable trades for themselves and giving the Advisers' clients unprofitable ones.

As further described above, the Defendants entire course of conduct constituted a course of business which operated "device, scheme, or artifice to defraud" and operated "as a fraud or deceit upon" upon the Advisers' clients in violation of Sections 206(1) and 206(2) of the Advisers Act. *Capital Gains Research Bureau, Inc.*, 375 U.S. at 186, 84 S.Ct. 275 (holding that an investment adviser violated Section 206(2) of the Advisers Act by failing to disclose trades it made for its own account that were contrary to its recommendations to advisory clients); *see Zion Capital Management LLC*, Advisers Act Release No. 2200 (Dec. 11, 2003) (investment adviser violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b–5 thereunder, and Sections 206(1) and 206(2) of the Advisers Act by engaging in cherry-picking scheme which favored account in which owner had an interest over that of an advisory client) (Commission Opinion).

### D. BROWN INVESTMENTS, KEN BROWN AND CIMILLUCA AIDED AND ABETTED VIOLATIONS OF THE ANTI–FRAUD PROVISIONS OF THE ADVISERS ACT (COUNT III)

The elements for liability under Section 17(a) of the Securities Act and Section 10(b) and Rule 10b–5 of the Exchange Act are more stringent than the requirements to violate Sections 206(1) and (2) of the Advisers Act.

Therefore, as a primary violator of the Sections 17(a) and 10(b), Ken Brown satisfies all the elements for aiding and abetting the less stringent cause of action arising from the same fraudulent cherry-picking scheme.

Similarly, as aiders and abettors of the more stringent fraud violations, Brown Investments and Cimilluca also satisfy the elements necessary to establish aiding and abetting the primary violations of the anti-fraud provisions of the Advisers Act arising from the same fraudulent cherry-picking scheme.

### E. THE ADVISERS, KEN AND WENDY BROWN VIOLATED SECTION 207 OF THE ADVISERS ACT (COUNT IV)

Under Section 207 of the Advisers Act, Brown & Company and 21st Century had a duty to file Forms ADV that were not false or misleading and that did not omit to state material facts. Section 207 of the Advisers Act makes it unlawful for "any person willfully to make" material misstatements and omissions in applications and reports filed with the Commission under the Advisers Act. 15 U.S.C. § 80b–7. A finding of willfulness does not require intent to violate (or scienter), but merely intent to do the act which constitutes a violation. *Wonsover v. SEC*, 205 F.3d 408, 413–15 (D.C.Cir.2000); *see Steadman*, 603 F.2d at 1135; *Arthur Lipper Corp. v. SEC*, 547 F.2d 171, 180 (2d Cir.1976); *Tager v. SEC*, 344 F.2d 5, 8 (2d Cir.1965).

■ Brown & Company, 21st Century, and Ken Brown violated Section 207 of the Advisers Act by filing Forms ADV, Part I that materially misrepresented the amount of assets under management. Ken and Wendy Brown were in charge of regulatory reporting for Brown & Company and 21st Century. Wendy Brown was responsible for compiling all the information contained in regulatory filings, including the Forms ADV. As a result, she is also liable for the false statements made in the Forms ADV.

Additionally, Ken and Wendy filed Forms ADV, Part II for Brown & Company and 21st Century that specifically stated "under no circumstances will the firm place its own interest ahead of our clients, nor will the firm take a position which could be detrimental to our clients [sic] position" while the Defendants cherry-picked profitable day trades from their Advisory Clients.

These Forms ADV, Part II also failed to disclose the internal procedures used to protect clients against the inherent conflict of interest and instead actually permitted the Defendants to disadvantage clients. *See Paul Joseph Sheehan,* Advisers Act Release No. 2211 (Feb. 3, 2004), and Litigation Release No. 18386 (Oct. 2, 2003) (adviser violated Section 207 by misrepresenting on Form ADV that he would "give absolute priority to client accounts" while he was allocating favorable trades to his own account at the expense of his clients). By submitting these false and misleading Forms ADV, Ken Brown, Wendy Brown, and the Advisers willfully violated Section 207 of the Advisers Act.

F. **THE ADVISERS, AIDED AND ABETTED BY KEN AND WENDY BROWN, VIOLATED SECTION 204 AND RULES 204–1(a)(2) AND 204–2(a)(8) OF THE ADVISERS ACT (COUNT V)**

Section 204 of the Advisers Act provides in pertinent part:

Every investment adviser . . . shall make and keep . . . such records[,] furnish such copies thereof and make and disseminate such reports as the Commission, by rule, may prescribe as necessary or appropriate in the public interest or for the protection of investors. All records . . . of such investment advisers are subject at any time, or from time to time, to such reasonable periodic, special, or other examinations by representatives of the Commission as the Com-

mission deems necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C § 80b–4

### *The Advisers Violated Rule 204–1(a)(2)*

▇▇▇ Section 204 of the Advisers Act and Rule 204–1 promulgated thereunder require periodic filing and amendment of Forms ADV by investment advisers. An application on Form ADV and any amendment thereto is deemed to be a "report" within the meaning of Rule 204. 15 U.S.C. § 80b–4

Rule 204–1(a)(2) of the Advisers Act specifically provides that a registered investment adviser must amend its Form ADV as required by the instructions to the Form ADV. 17 C.F.R. § 275.204–1(a)(2). The instructions to the Form ADV specify that a registrant must, in addition to the annual amendment, update its Form ADV *promptly* if information provided in Part II becomes materially inaccurate. Part II of the Advisers' Forms ADV became materially inaccurate in September of 2002 when Cimilluca began day-trading the Brown Trading Account and executing the Advisers' client account trades, thereby creating a conflict of interest that required disclosure. Subsequent updates to their Forms ADV only added false statements to conceal the ongoing fraud.

Brown & Company and 21st Century violated Section 204 and Rule 204–1(a)(2) of the Advisers Act by failing promptly to amend its Forms ADV to accurately disclose the conflict of interest created by the cherry-picking scheme. Ken and Wendy Brown were the only officers and compliance personnel at the Advisers responsible for filing all Forms ADV. Thus, Ken and Wendy Brown aided and abetted Brown & Company and 21st Century's violations of Section 204 and Rule 204–1(a)(2) of the Advisers Act.

### The Advisers Violated Rule 204–2(a)(8)

Rule 204–2(a)(8) of the Advisers Act requires that registered investment advisers "make and keep true, accurate and current . . . a list or other record of all accounts in which the investment adviser is vested with any discretionary power with respect to the funds, securities or transactions of any client." 17 C.F.R. § 275.204–2(a)(8). Despite numerous requests during the examination, subsequent investigation, and this action, Brown & Company and 21st Century never produced documentation to support the assets under management reported in their Forms ADV. Accordingly, Brown & Company and 21st Century violated Section 204 of the Advisers Act and Rule 204–2(a)(8) thereunder by failing to maintain such records and produce them to the Commission.

Ken and Wendy Brown were the only officers at the Advisers responsible for compliance, regulatory reporting and records maintenance. Thus, Ken and Wendy Brown aided and·abetted Brown & Company and 21st Century's violations of Section 204 and Rule 204–2(a)(8) of the Advisers Act.

### IV. REMEDIES

#### A. PERMANENT INJUNCTION

■ Section 20(b) of the Securities Act, Section 21(d) of the Exchange Act and Section 209(d) of the Advisers Act authorize the SEC to seek permanent injunctive relief. The SEC is entitled to a permanent injunction if it establishes a prima facie case of previous violations of the securities laws and a reasonable likelihood the defendant will repeat the wrongs. *Calvo*, 378 F.3d at 1216. It is important to remember the SEC appears in this matter "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the securities laws." *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir.1975).

Therefore, the SEC does not have to show irreparable injury or a balance of the equities in its favor. *See, e.g., SEC v. Unifund SAL*, 910 F.2d 1028, 1036 (2d Cir.1990).

■ The SEC established Defendants' past violations of numerous securities laws. In determining whether there is a reasonable likelihood the Defendants will repeat these violations if not enjoined, the Court should consider: (1) the egregiousness of the Defendants' actions; (2) the isolated or recurrent nature of the violations; (3) the degree of scienter involved; (4) the Defendants' recognition of the wrongful nature of their conduct; (5) the sincerity of the Defendants' assurances against future violations; and (6) the likelihood the Defendants' occupations will present opportunities for future violations. *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir.2004).

Consideration of these factors in this case leads inexorably to the conclusion that a permanent injunction is fully warranted. The SEC has shown the Defendants violated the antifraud provisions, and books and records provisions of the federal securities laws by conducting a cherry-picking scheme to enrich themselves at the expense of the Advisers' clients while assuring that "under no circumstances will the firm place its own interest ahead of our clients." The Defendants' conduct was highly egregious, pervasive, premeditated and caused the Advisers' clients to sustain millions of dollars in damages. The Defendants' scienter is highlighted by the pains they took to hide the nature of the fraud. Given these actions by the Defendants, any assurances the Defendants make against future violations are clearly disingenuous. Based on these factors, a permanent injunction prohibiting the Defendants from committing future violations of the securities laws is warranted.

## B. *DISGORGEMENT*

A federal district court's authority to order disgorgement in a SEC enforcement action is well established. *See, e.g., SEC v. Lorin,* 76 F.3d 458, 461–62 (2d Cir.1996)(per curiam); *SEC v. Wencke,* 783 F.2d 829, 837 n. 9 (9th Cir.), *cert. denied,* 479 U.S. 818, 107 S.Ct. 77, 93 L.Ed.2d 33 (1986). Disgorgement is designed both to deprive a wrongdoer of unjust enrichment and deter others from violating the securities laws. *SEC v. First City Fin. Corp.,* 890 F.2d 1215, 1230 (D.C.Cir.1989); *Manor Nursing Centers,* 458 F.2d at 1103–04 ("the effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable"). Where, as here, the fraud is pervasive, the Court should order the wrongdoer to disgorge all profits stemming from the scheme. *CFTC v. British Am. Commodity Options Corp.,* 788 F.2d 92, 93–94 (2d Cir.), *cert. denied,* 479 U.S. 853, 107 S.Ct. 186, 93 L.Ed.2d 120 (1986).

The law does not require precision in determining the proper amount of disgorgement. "The District Court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." *SEC v. First Jersey Sec. Inc.,* 101 F.3d 1450, 1474–75 (2d Cir.1996), *cert. denied,* 522 U.S. 812, 118 S.Ct. 57, 139 L.Ed.2d 21 (1997). The amount of disgorgement ordered "need only be a reasonable approximation of profits causally connected to the violation." *First City,* 890 F.2d at 1231. Once the SEC presents evidence reasonably approximating the amount of a Defendant's ill-gotten gains, then the burden of proof shifts to the defendant. *See First City,* 890 F.2d at 1232; *see also SEC v. Hughes Capital Corp.,* 917 F.Supp. 1080, 1085 (D.N.J. 1996), *aff'd,* 124 F.3d 449 (3d Cir.1997). The defendant is then "obliged clearly to demonstrate that the disgorgement figure

[is] not a reasonable approximation." *First City,* 890 F.2d at 1232.

Moreover, since fraudsters rarely keep accurate records of the proceeds of their crimes, any "risk of uncertainty about exact amount received falls on the wrongdoer whose illegal conduct created the uncertainty" *SEC v. Lauer,* 445 F.Supp.2d 1362, 1370 n. 11 (S.D.Fla.2006) (citing *SEC v. Inorganic Recycling Corp.,* 2002 WL 1968341, at *2 (S.D.N.Y. Aug.23, 2002))

At trial Plaintiff's expert demonstrated with nearly exact precision that Defendants took $4.5 million in profits as a result of their illegal cherry-picking scheme. *See* TT 1452–61, Vol. 7; TT 1490–92, Vol. 8 & Exs. 811, 815–1; TT 1741–44, Vol. 9; TT 1745–50, Vol. 9; TT 1541–42, Vol. 8; TT 1540–41, Vol. 8; TT 634–35, Vol. 3; TT 670–71, Vol. 4; and, Plaintiff's Trial Exs. 552, 803, 992–94, 202a, 118, and 503. Plaintiff's expert also proved that in order to obtain those profits, Defendants stuck the Advisory Clients with millions of dollars in losses the Brown Trading Account would have realized from unprofitable day trades. *Id.* and TT 451–55, Vol. 3; TT 1149–51, Vol. 6 & Ex 470; TT 484–90, Vol. 3 & Exs. 470, 501 & 817; TT 474–84, Vol. 3; TT 1189–94 & 1196–99, Vol. 6 & Ex. 501; Trial Ex. 715 at 1–5. While the Court agrees that Defendants were unjustly enriched by the losses they avoided, Plaintiff has cited no case law and independent research has uncovered none to support Plaintiff's contention that Defendants should be ordered to disgorge not only the profits they obtained as a result of their fraud, but all unrealized losses as well. Indeed, in *First City,* 890 F.2d at 1230, cited by Plaintiffs, and by numerous other courts as well, disgorgement is said to be a "reasonable approximation of the *profits* casually connected to the violation." (Emphasis added) There is no mention there, or in any other case the under-

signed could find, of disgorgement of losses avoided. Accordingly, the Court finds that disgorgement in this case should be limited to the $4.5 million in profits Defendants obtained. The Court further orders Cimilluca to disgorge all profits generated in the Related Accounts for which he acted as the registered representative and made all investment decisions. In this respect Cimilluca is held liable for the $296,147 he diverted to his account and accounts he managed by placing 99.65% winning trades into these accounts. (See Trial Ex. 816)

## C. JOINT AND SEVERAL LIABILITY

██ The Court orders that Defendants are to be held jointly and severally liable for the total amount of the fraud. When two or more individuals or entities collaborate or have close relationships in engaging in the securities laws violations, they may be held jointly and severally liable for the entire amount of the fraud. *SEC v. JT Wallenbrock & Associates, et al.*, 440 F.3d 1109 (9th Cir.2006); *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d Cir.1997) (holding a defendant jointly and severally liable for disgorgement); *SEC v. Berger*, 244 F.Supp.2d 180 (S.D.N.Y.2001) (defendant jointly and severally liable because he conceived fraud and controlled corporate defendant). It is clear from the evidence presented that the Defendants collaborated in the securities laws violations.

## D. PREJUDGMENT INTEREST

██ Where a securities law violator has enjoyed access to funds over a period of time as a result of his or her wrongdoing, requiring the wrongdoer to pay pre-judgment interest is consistent with the equitable purpose of the remedy of disgorgement. *Hughes*, 917 F.Supp. at 1090. Defendants' wrongdoing justifies awards of prejudgment interest in accord with the doctrines of fundamental fairness. *See Tome*, 638 F.Supp. at 639. In the context of Section 10(b) and Rule 10b–5 actions, like the case at bar, proof of defendants' scienter is sufficient to justify an award of prejudgment interest. *See Rolf v. Blyth*, 637 F.2d 77, 87 (2d Cir.1980). In calculating prejudgment interest, the Court looks to the delinquent tax rate as established by the Internal Revenue Service, IRC § 6621(a)(2), and assessed on a quarterly basis, from approximately when Defendants first received use of these ill-gotten profits through the trial in this matter. *SEC v. Poirier*, 140 F.Supp.2d 1033, 1047 (D.Ariz.2001).

In this regard the SEC is ordered to calculate pre-judgment interest, in accordance with the delinquent tax rate as established by the Internal Revenue Service, IRC § 6621(a)(2), and assessed on a quarterly basis, on the profits Defendants jointly received from their illegal activities, based on the principal amount of $4.5 million that Defendants received in ill-gotten gains and the $296,147 Cimmiluca diverted to his account and accounts he managed by placing 99.65% winning trades into these accounts. (See Trial Ex. 816). Defendants shall thereafter be held jointly and severally liable for the sum so determined in and for disgorgement and prejudgment interest.

## E. CIVIL PENALTIES

The SEC seeks the imposition of the maximum civil penalties against all Defendants under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78(d)(3), and Section 209(e) of the Advisers Act, 15 U.S.C. § 80b–9. The fraudulent conduct started in September 2002 and lasted through at least June 2006. The penalty amounts adjusted for inflation during the period of Defendants' violations vary according to the time the violations took place. Accordingly, the applicable penalty amount for violations occurring before

February 14, 2005 appears below in the normal text and the applicable amount for violations occurring afterwards appears in the brackets. *See* 17 C.F.R. Pt. 201, §§ 201.1001–1002, and 1003.

The statutes under which the SEC seeks penalties are essentially identical and establish three tiers of penalties. Under the "First Tier" the court may impose, for each violation, a penalty not to exceed the greater of (i) $6,500 [$6,500] for a natural person for each violation or $60,000 [$65,000] for any other person, or (ii) the gross amount of pecuniary gain as a result of the violation.

Under the "Second Tier" the Court may impose, for each violation, a penalty not to exceed the greater of (i) $60,000 [$65,000] for a natural person or $300,000 [$325,000] for any other person, or (ii) the gross amount of pecuniary gain as a result of the violation. The Second Tier applies where the violation involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement."

Finally, under the "Third Tier" the Court may impose, for each violation, a penalty not to exceed the greater of (i) $120,000 [$130,000] for a natural person or $600,000 [$650,000] for any other person, or (ii) the gross amount of pecuniary gain as a result of the violation. The Third Tier applies where the requirements of a Second Tier penalty are present *and* the violation "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."

As noted above, the Court may impose a penalty for *each* violation. *See U.S.S.E.C. v. Henke,* 275 F.Supp.2d 1075, 1086 (N.D.Cal.2003) (where the Court imposed $100,000 penalties "for each of the violations alleged" in the SEC's complaint). As further explained by the Court, in *SEC v. Lybrand,* 281 F.Supp.2d 726, 729–30 (S.D.N.Y.2003), a primary purpose of a civil penalty is to serve as a deterrent:

*A monetary penalty is designed to serve as a deterrent* against securities law violations. *See SEC v. Palmisano,* 135 F.3d 860, 866 (2d Cir.1998); *SEC v. Tanner,* 02 Civ. 0306, 2003 WL 21523978, *2 (S.D.N.Y. July 3, 2003); *SEC v. Moran,* 944 F.Supp. 286, 296 (S.D.N.Y.1996). As set forth in H.R. Report No. 616—the Report of the Committee on Energy and Commerce of the U.S. House of Representatives on the Remedy Act,

*[T]he money penalties proposed in this legislation are needed to provide financial disincentives to securities law violations* other than insider trading ... Disgorgement merely requires the return of wrongfully obtained profits; *it does not result in any actual economic penalty or act as a financial disincentive to engage in securities fraud* .... The Committee therefore concluded that authority to seek or *impose substantial money penalties,* in addition to the disgorgement of profits, *is necessary for the deterrence of securities law violations* that otherwise may provide great financial returns to the violator. (Emphasis added and citations omitted).

Based upon the public policy objective of deterrence, the SEC submits and the Court agrees that a substantial penalty is necessary and appropriate to financially punish the Defendants for their repeated unlawful activities and to deter others from engaging in violations of the federal securities laws. The Court also finds significant evidence proving both "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" (second and third tier requirement) and that the violation "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons" (third tier requirement).

Factors courts have considered include the egregiousness of the violation, the isolated or repeated nature of the violations, the degree of scienter involved and the deterrent effect given the defendant's financial worth. *SEC v. Yun*, 148 F.Supp.2d 1287 (M.D.Fla.2001).[6] Application of these factors to the egregious and recurring misconduct that occurred in this case drastically tilts the scales in favor of substantial third tier civil penalties against Defendants.

In the case at bar, every month for 46 months Defendants caused substantial losses to investors since investors were losing approximately $200,000 a month due to Defendants' cherry picking scheme. Hence, the Court could easily impose 46 third-tier penalties against Defendants or an amount equal to their pecuniary gain. Considering, the extent and duration of the fraud, the Defendants' scienter, the substantial losses visited on the victims of the fraud, the lack of cooperation exhibited by the Defendants, and the false testimony and cover-ups practiced by the Defendants, the Court finds a significant third tier penalty is appropriate. In accordance with the foregoing, the Court imposes on Defendants Brown & Company, 21st Century and Brown Investments, a third-tier civil penalty of $4.5 million dollars, a sum equal to Defendants' pecuniary gain. As to Defendant Cimmiluca, the Court imposes on him a third-tier civil penalty of $250,000 to be paid by Cimmiluca, individually. As to Defendant Ken Brown, the Court imposes on him a third-tier civil penalty of $250,000, to be paid by Ken Brown individually. As to Defendant Wendy Brown, taking into account her more limited role in the corporations, and noting that while she was the compliance officer, it was her husband, Ken Brown, who held himself out as an investment adviser, was responsible for the day-to-day operations of the corporations, and made the majority of the corporate decisions, the Court imposes on her a third-tier civil penalty of $100,000 to be paid by Wendy Brown, individually.

To the extent any of the foregoing Conclusions of Law constitute Findings of Fact, they are hereby adopted as both. A separate Final Judgment shall be entered herein consistent with the Court's Findings of Fact and Conclusions of Law.

**DONE AND ORDERED.**

### *FINAL JUDGMENT FOR PLAINTIFF AND ORDER CLOSING CASE*

**THIS CAUSE** came on for non-jury trial, Magistrate Linnea R. Johnson presiding by agreement of the parties, on Plaintiff's, Security Exchange Commission's ("SEC's") action for injunctive and other relief against Defendants K.W. Brown & Company ("Brown & Company"), 21st Century Advisors, Inc. ("21st Century"), (collectively the "Advisers"), K.W. Brown Investments, Inc. ("Brown Investments"), Kenneth Brown ("Ken Brown"), Wendy Brown ("Wendy Brown") and Michael Cimilluca ("Cimilluca") (collectively "Defendants"), for violations of the anti-fraud and books and records provisions of the federal securities laws. The Complaint sounds in five counts, all involving an alleged cherry-picking scheme which Plaintiff contends netted the Defendants more than 4 million dollars while illegally passing more than 9 million dollars of losses onto unsuspecting investors who had placed their trust in Ken Brown and the Investment Advisers.

---

**6.** The undersigned notes that courts in the Southern District of New York have considered additional factors such as "defendants' lack of cooperation and honesty with authorities" and "defendants' failure to admit to their wrongdoing." *SEC v. Lybrand*, 281 F.Supp.2d at 730 (string-cite omitted).

Specifically, the Complaint alleges: violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") against Defendants Brown & Company, 21st Century, and Ken Brown (Count I); violations of Section 10(b) and Rule 10(b)–5 of the Securities Exchange Act of 1934 ("Exchange Act") against Defendants Brown & Company, 21st Century, and Ken Brown as primary violators and Defendants Cimilluca and Brown Investments as aiders and abettors (Count II); violations of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") against Defendants Brown & Company and 21st Century, as primary violators and Defendants Ken Brown, Cimilluca and Brown Investments as aiders and abettors (Count III); violations of Section 207 of the Advisers Act against Defendants Brown & Company, 21st Century, Ken Brown and Wendy Brown (Count IV); and, violations of Section 204 and Rules 204–1(a)(2) and 204–2(a)(8) of the Advisers Act against Defendants Brown & Company and 21st Century as primary violators and Ken Brown and Wendy Brown as aiders and abettors.

The issues having been tried and the Court finding that based upon the evidence and testimony submitted and considering the relevant case law, judgment should be rendered in favor of Plaintiff and against Defendants on all counts of the Complaint, it is hereby,

**ORDERED AND ADJUDGED** as follows:

(1) judgment shall be entered in favor of the Plaintiff SEC and against the Defendants Brown & Company, 21st Century, Brown Investments, Ken Brown, Wendy Brown and Michael Cimilluca on all counts of the Complaint;

(2) Defendants and Defendants' agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating, directly or indirectly, Section 17(a) of the Securities Act of 1933 ("Securities Act"), Section 10(b) and Rule 10(b)–5 of the Securities Exchange Act of 1934 ("Exchange Act"), Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act"), Section 207 of the Advisers Act, and Section 204 and Rules 204–1(a)(2) and 204–2(a)(8) of the Advisers Act;

(3) Defendants are hereby ordered to disgorge all profits made from their cherry-picking scheme. In this regard the Defendants are held jointly and severally liable, and are responsible for disgorging the $4.5 million in profits Defendants obtained. Defendants are also held jointly and severally liable, and are responsible for disgorging the $296,147 Cimilluca diverted to his account and accounts Cimilluca managed by placing 99.65% winning trades into these accounts. (See Trial Ex. 816). Defendants are hereby ordered to disgorge the sums referred to in this paragraph within fifteen (15) days after entry of this Final Judgment by certified check, bank cashiers check, or United States postal money order payable to the Securities and Exchange Commission;

(3) Defendants are ordered to pay prejudgment interest on the sums owed which shall be calculated in accordance with the delinquent tax rate as established by the Internal Revenue Service, IRC § 6621(a)(2), and assessed on a quarterly basis, on the profits Defendants jointly received from their illegal activities, based on the principal amount of $4.5 million Defendants received in ill-gotten gains and the $296,147 Cimilluca diverted to his account and accounts he managed. Defendants are ordered to make this payment within fifteen (15) days after entry of this Final Judgment by certified check, bank cashiers check, or United States postal

money order payable to the Securities and Exchange Commission;

(4) Civil penalties are hereby assessed against all Defendants under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78(d)(3), and Section 209(e) of the Advisers Act, 15 U.S.C. § 80b–9. In this regard the Court imposes on Defendants Brown & Company, 21st Century and Brown Investments, a third-tier civil penalty of $4.5 million dollars, a sum equal to Defendants' pecuniary gain. As to Defendant Cimilluca, the Court imposes on him a third-tier civil penalty of $250,000 to be paid by Cimilluca, individually. As to Defendant Ken Brown, the Court imposes on him a third-tier civil penalty of $250,000, to be paid by Ken Brown individually. As to Defendant Wendy Brown, taking into account her more limited role in the corporations, and noting that while she was the compliance officer, it was her husband, Ken Brown who held himself out as an investment adviser, was responsible for the day-to-day operations of the corporations, and made the majority of the corporate decisions, the Court imposes on her a third-tier civil penalty of $100,000 to be paid by Wendy Brown, individually. Defendants are ordered to make this payment within fifteen (15) days after entry of this Final Judgment by certified check, bank cashiers check, or United States postal money order payable to the Securities and Exchange Commission;

(5) This Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment;

(6) There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Final Judgment forthwith and without further notice; and,

(7) The Clerk's Office is directed to close this case and deny any and all pending motions as moot.

**DONE AND ORDERED.**

*ORDER SUPPLEMENTING FINAL JUDGEMENT FOR PLAINTIFF AGAINST DEFENDANTS K.W. BROWN & COMPANY, 21ST CENTURY ADVISORS, INC., K.W. BROWN INVESTMENTS, INC., KENNETH BROWN, WENDY BROWN AND MICHAEL CIMILLUCA*

THIS CAUSE comes before the Court upon Plaintiff Securities and Exchange Commission's ("SEC") Motion Supplement the Final Judgment for Plaintiff and Order Closing Case. The Court has fully considered the Motion, the record herein and being fully advised of the premises; accordingly, it is hereby **ORDERED AND ADJUDGED** that the SEC's Motion to Supplement the Order is **GRANTED** and the Final Judgment (DE 105) is supplemented as follows:

**I.**

*PREJUDGMENT INTEREST*

In addition to imposing a civil penalty of $4.5 million against K.W. Brown & Company ("Brown & Company"), 21st Century Advisors, Inc. ("21st Century") and K.W. Brown Investments, Inc. ("Brown Investments"), jointly and severally; $250,000 civil penalty against Kenneth Brown ("Ken Brown") and Michael Cimilluca ("Cimilluca"), respectively; and $100,000 civil penalty against Wendy Brown; and holding the Defendants jointly and severally liable for disgorgement of $4,796,147 as a result of their violations of the federal securities laws, the Final Judgment also ordered Defendants Brown & Company, 21st Century, Brown Investments, Ken Brown, Wendy

Brown, and Cimilluca (collectively "Defendants") to pay prejudgment interest on the disgorgement amount. By way of this Supplemental Order, Defendants are ordered, jointly and severally, to pay prejudgment interest in the amount of $983,586 on the $4.5 million of disgorgement relating to the illegal profits from the Brown Trading Account and $74,779 on the $296,147 of disgorgement relating to illegal profits relating to the Cimilluca Accounts. Accordingly, in the aggregate Defendants are ordered to pay $1,058,365 in prejudgment interest within fifteen (15) days from the date of issuance of this order.

## II.

### *PAYMENT INSTRUCTIONS*

**IT IS FURTHER ORDERED AND ADJUDGED** that Defendants shall make all payments due under the Final Judgment and this Order to the SEC, by sending a U.S. postal money order, certified check, bank cashier's check or bank money order payable to the Clerk of this Court, under cover of a letter that identifies the payee as a Defendant in this action, setting forth the title and civil action number of this action and the name of this Court, and specifying that payment is made pursuant to the Final Judgment and this Supplemental Order. Copies of such check and accompanying cover letter shall be simultaneously transmitted to Christopher E. Martin, Senior Trial Counsel, U.S. Securities and Exchange Commission, Southeast Regional Office, 801 Brickell Avenue, Suite 1800, Miami, Florida 33131.

By making the payments due under the Final Judgment, Defendants relinquish all legal and equitable right, title, and interest in such funds, and no part of the funds shall be returned to Defendants. The Clerk shall deposit the funds into an interest bearing account with the Court Registry Investment System ("CRIS"). These funds, together with any interest and income earned thereon (collectively, the "Fund") shall be held by the CRIS until further order of the Court. In accordance with the guidelines set by the Director of the Administrative Office of the United States Courts ("DAOUSC"), the Clerk is directed, without further order of this Court, to deduct from the income earned on the money in the Fund a fee equal to ten percent of the income earned on the Fund. Such fee shall not exceed that authorized by the Judicial Conference of the United States ("JCUS"). The SEC may by motion propose a plan to distribute the Fund subject to the Court's approval. Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes–Oxley Act of 2002.

**DONE AND ORDERED.**